## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| United States of America, | } | |
| *Appellee* | } | |
| | } | Appeal Nos. 13-4711(L) |
| v. | } | 13-4818 & |
| | } | 13-4863 |
| Stephen Fields *et al.,* | } | |
| *Appellants* | } | |

## APPELLANTS' PROPOSED OPENING BRIEF

## STATEMENT OF JURISDICTION

This is a consolidated appeal from final judgments of conviction and corresponding forfeiture and restitution judgments entered against Stephen Fields ("Fields"), Edward J. Woodard ("Woodard"), and Troy Brandon Woodard ("Brandon").

The final judgment of conviction against Stephen Fields was entered on September 17, 2013 (Dkt. 552), and Fields filed his notice of appeal on September 18, 2013 (Dkt. 557). The final judgment of conviction against Edward J. Woodard was entered on October 11, 2013, and Woodard filed his notice of appeal on November 18, 2013. The final judgment of conviction against Troy Brandon Woodard was entered on October 1, 2013, and Brandon filed his notice of appeal on October 11, 2013.

The district court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

### By Appellant Stephen Fields

1.  Did the district court err in excluding defense evidence at trial:

    (a) by excluding out-of-court statements offered for non-hearsay purposes, on the view that the hearsay rule excludes any statement "offered to support the defense";

    (b) by preventing proper cross-examination of prosecution witnesses under Evidence Rule 608(b), on the view that a witness cannot be questioned on "uncharged misconduct";

    (c) by excluding relevant evidence arbitrarily in reference to the prosecution's alleged conspiracy period, and by excluding  defense evidence of industry conditions created by the largest financial crises in U.S. history; and

    (d) by placing arbitrary time limits on defendant Field's direct testimony?

2. Did the district court err in admitting unqualified expert testimony as putative "lay" opinion testimony, as is expressly forbidden by Evidence Rules 701 and 702?

3. By reason of the foregoing errors, was defendant Fields denied his constitutional rights under the 5th and 6th Amendments to a fair trial, to confront his accusers, and to present his defense?

### By Appellant Edward J. Woodard

1. Whether the district court erred in determining that the evidence was sufficient to support the judgments of conviction of Ed Woodard on all counts.

2. Whether the district court erred in refusing to admit testimony of witnesses and exhibits concerning National Financial Crisis of 2008-2012, and its effect on the Bank of the Commonwealth.

3. Whether the District Court erred in refusing to admit testimony of witnesses and exhibits concerning the $700 Billion United States Government's Troubled Asset Relief Program ("TARP") of October 3, 2008 ("the Bank's Bail Out Bill") and its relationship to the Bank of the Commonwealth.

### By Appellant Troy Brandon Woodard

1. Whether the district court erred by failing to dismiss Count 1, Conspiracy, for insufficient evidence.

2. Whether the district court erred by failing to dismiss Counts 16 – 18, Unlawful Participation in a Loan, for insufficient evidence.

3. Whether the district court erred in calculating the loss attributable to Brandon.

4. Whether the district court erred by imposing a two-level increase for abuse of a position of trust.

## STATEMENT OF THE CASE

This case involves an indictment that sought to lay blame for one of the many bank failures resulting from the 2008 financial crisis to employees of that bank, retrospectively characterizing their actions during the crisis as an alleged "conspiracy to defraud" the Bank of Commonwealth ("Bank" or "BOC"). The defense sought to show that the challenged actions were, in fact, good faith efforts to protect the Bank's interests during an extraordinary financial crisis that arose from an unprecedented expansion in real estate lending.

At trial, the Government was given wide leeway to present its theory of the case for six weeks, far longer than the Government predicted its case would take. Through multiple erroneous evidentiary rulings by the district court, however, the jury was not allowed to hear the defense case. As a result, the defendants did not receive a fair trial.

**A. Procedural History.**

The indictment was returned on July 11, 2012, (Dkt. 1), and replaced by a superseding indictment on December 20, 2012. (Dkt. 191). The defendants were: (1) Edward Woodard, the President and chairman of the board of directors at the Bank; (2) Simon Hounslow[1], an Executive Vice President and the Chief Lending Officer of the Bank; (3) Stephen Fields, an Executive Vice President and a Commercial Loan Officer at the Bank; (4) Troy Brandon Woodard, a Mortgage Specialist employed in a subsidiary of the Bank; and (5) Dwight Etheridge, one of several large troubled borrowers who did business with the Bank.

The case went to trial in March 2013, and continued for eight weeks, of which six weeks were consumed by the government's case-in-chief. Stephen Fields had three days to present his defense case. He was convicted on Counts 1 (conspiracy to commit bank fraud), 5 and 6 (false entry in a bank record), 10 (misapplication of bank funds), 13 (false statement to a financial institution), and 14 (misapplication of bank funds), but acquitted on Count 15 (false statement to a financial institution). (Tr. 5/24/2013 at 119-20). On September 17, 2013, the district court sentenced Mr. Fields to 204 months imprisonment on each count, with the sentences to run concurrently. (Dkt. 547).

---

[1] Simon Hounslow was acquitted of all charges, though the Government's allegations against Mr. Hounslow were essentially the same as those against Mr. Fields. The difference in outcome is important, because it shows how Fields' defense was sabotaged by the district court's erroneous evidentiary rulings.

Ed Woodard was charged with Conspiracy to Commit Bank Fraud (18 U.S.C. § 1349); False Entry in a Bank Record (18 U.S.C. §§ 1005 & 2); three counts of Unlawful Participation in a loan (18 U.S.C. §§ 1005 & 2); two counts of False Statements to a Financial Institution (18 U.S.C. §§1014 & 2); two counts of Misapplication of Bank Funds (18 U.S.C. §§ 656 & 2); and Bank Fraud (18 U.S.C. §§ 1344 & 2). He was convicted on all counts except Count 11 (Misapplication of Bank Funds). Woodard was sentenced to a term of imprisonment of Two Hundred and Seventy-Six (276) months on each count, all to be served concurrently.

Brandon Woodard was charged in five counts: Count 1, Conspiracy to Commit Bank Fraud in violation of 18 U.S.C. § 1349; Counts 16 – 18, Unlawful Participation in a Loan in violation of 18 U.S.C. § 1005; and Count 26, Bank Fraud in violation of 18 U.S.C. § 1344. He was convicted on Counts 1 and 16 – 18, and acquitted on Count 26. On September 30, 2013, Brandon was sentenced to 96 months on each count, to run concurrently, and was placed on five years' supervised probation on each count, to run concurrently. The Court ordered restitution in the amount of $2,446,296.05.

**B. Statement of Facts as to Stephen Fields.**

The jury was never allowed to fully consider the most important background facts to this entire case: *i.e.*, the truly extraordinary conditions created by the

financial meltdown of 2008. That crisis in turn had been caused by preceding years of rapid expansion in all forms of credit, especially those based on or derived from real estate and construction financing. Although the Government's own indictment had featured some of these background facts, the defense was not allowed at trial to present its side of the case.

### 1. The indictment and the prosecution's theory of the case.

The prosecution's theory generally was to invent an alleged "conspiracy" among certain employees and borrowers of the Bank by re-characterizing the employees' actions—taken to protect the borrowers' eventual ability to repay their loans and thus prevent the Bank's failure—as "overt acts" of a conspiracy to defraud the Bank.

### Count 1 – Conspiracy to commit bank fraud.

The Government's theory with respect to the conspiracy charge can be summarized into three allegations.

First, the Government alleged that Bank insiders such as Mr. Fields concealed the true financial condition of the Bank by employing a variety of "unsafe and unsound" banking practices including: extending new loans for borrowers to pay interest on existing loans, overdrawing borrowers' checking accounts to pay interest, and executing Change-in-Terms Agreements ("CITAs") to keep loans current.

Second, the Government alleged that Bank insiders provided preferential treatment to troubled borrowers by approving interest-only loans, funding construction draws without adequate documentation, permitting the borrowers to use loan proceeds for purposes other than what was specified in the loan agreement, approving loans to troubled borrowers without current financial information, and extending loans to nominee borrowers after the Bank was prohibited from extending additional loans to the actual borrower.

Third, the Government alleged that the troubled borrowers performed favors for Bank insiders in return. These favors included purchasing bank-owned property at foreclosure sales, and purchasing real property from two of the defendants. The sole benefit Mr. Fields allegedly received was a set of kitchen countertops worth about $6,000—a fact disputed by the defense, and affected by the district court's rulings under hearsay and Rule 608(b).

### Counts 5 and 6 – False entry in a bank record.

Counts 5 and 6 both charged Mr. Fields with making false entries in a bank record.  The evidence at trial showed that the board of directors at the Bank received monthly past-due loan reports. When Mr. Fields used CITAs, overdrafts, or made new loans for borrowers to pay interest on existing loans, this caused certain loans to not appear on the past-due report. The Government alleged that

these practices were fraudulent because Mr. Fields "had no legitimate explanation" to use them, other than to conceal the status of his loans.  (Tr. 5/15/2013 at 70).

### Count 10 – Misapplication of bank funds.

Count 10 charged Mr. Fields with misapplication of bank funds. The Government alleged that Mr. Fields and Ed Woodard asked Tom Arney ("Arney"), a borrower, to purchase stock from a competitor bank. (Tr. 5/15/2013 at 25-26). According to the Government, Mr. Fields approved a loan for Arney to purchase 100 shares of stock even though he knew that Arney would only purchase 60 shares. The Government argued that this transaction was fraudulent because the bank records indicated that the collateral was 100 shares of stock, and Mr. Fields knew that the actual collateral was only 60 shares.  (Tr. 5/15/2013 at 27).

### Counts 13, 14, and 15[2] – Misapplication of bank funds and false statement to a financial institution.

Counts 13 and 15 charged Mr. Fields with making a false statement to a financial institution. Count 14 charged Mr. Fields with misapplication of bank funds. Although charged under different statutes, the Government's theory with respect to each count was that Mr. Fields approved loans to individuals or entities

---

[2]    While Mr. Fields was acquitted on Count 15, we include a brief discussion of this Count because the Government alleged that the substantive counts correspond to overt acts in the conspiracy.

knowing that they were acting as nominee borrowers for Arney. (Tr. 5/15/2013 at 28, 30, 32).

## 2. Stephen Fields's defense theory.

The basic facts concerning the banking transactions at issue were not disputed at trial. However, what was sharply disputed was the characterizations placed on those transactions by the Government, and the knowledge and intent associated with them. Mr. Fields defended primarily on the ground that he lacked the criminal *mens rea* necessary for conviction under all of the charged counts. His effort at trial was to show that the allegedly fraudulent loan transactions and banking practices were, in fact, his good faith efforts to preserve the borrowers' eventual ability to repay and to allow the Bank to survive the financial crisis. Thus, his counsel attempted to establish at trial the following:

First, to rebut the Government's theory that the defendants formed a conspiracy in 2008, and to show that Mr. Fields did not act with criminal intent, Mr. Fields's counsel sought to show that the allegedly fraudulent banking practices have been used at BOC without controversy for years before the alleged conspiracy began; that these practices were not unique to BOC; that they were used openly, were known to the bank examiners, Board of Directors, and the Bank's internal auditor; and that while sometimes these practices criticized, they were

never labeled as fraudulent. He was prevented from introducing evidence on many of these points.

Second, his counsel also attempted to show that Mr. Fields's behavior was inconsistent with someone who acted with fraudulent intent—because unlike an individual knowingly involved in a fraud conspiracy, Mr. Fields made no effort to conceal the transactions. The district court did not allow him to present evidence that when he had an opportunity to sell off non-performing loans at the Bank, he retained the loans associated with three major borrowers who were alleged co-conspirators (and who ultimately defaulted on their loans), thus rebutting the Government's theory that his motive was to conceal bad loans.

Third, his counsel tried to introduce evidence of Mr. Fields's good faith through testimony that he informally checked on the status of the borrowers' construction projects, and obtained new collateral each time he extended a loan. An important part of this defense was excluded when the district court refused to admit evidence of statements and documents from the borrowers themselves concerning how they intended to repay the loans, which were offered to show that Mr. Fields relied on these representations in good faith.

Fourth, to explain the "preferential treatment" identified by the Government as evidence of a conspiracy—*e.g*., funding construction draws without adequate documentation and extending new loans to borrowers without current financial

information—his counsel sought to introduce evidence that these practices were identified to the Board as problems as early as 2002, without any indication that they were fraudulent in nature. Again, this evidence was excluded from consideration as a result of the district court's rulings

Finally, Mr. Fields sought to show the witnesses who testified against him—particularly Eric Menden and George Hranowskyj–were experts at lying and corrupting the judicial process. This was important not only to discredit testimony, but also to provide circumstantial evidence for the jury to understand why Mr. Fields would have been deceived by these two individuals regarding their ability and intention to repay loans. Relying on an erroneous view of the governing law, the district court prevented Mr. Fields from cross-examining these witnesses because they were not formally prosecuted for their conduct.

The foregoing examples are only some of the district court's rulings on appeal. Those rulings significantly altered the quantum of evidence in the Government's favor, and deprived Mr. Fields of a fair trial.

**C. Statement of Facts as to Edward Woodard.**

Edward J. Woodard is 70 years old.

In 1972, at age 29, after one year at Bank of the Commonwealth, he was elected President of the Bank where he remained as CEO for 38 years until 2010.

Over the years, when the Bank's financial position was in jeopardy, Defendant, Woodard, as CEO "stepped in" and at his substantial personal expense helped the Bank through those financial periods.

He voluntarily gave up or waived very valuable 400 hours of Sick Leave and Vacation Benefits accrued from 1988 until 2010. (4/26/13 tr 6792)

He also gave up a substantial deferred retirement plan that he had earned over 38 years amounting to $1.5 million dollars in value. (4/26/13 tr 6792), strong evidence that he never intended to "defraud" or "injure" the Bank.

Simon Hounslow, an Executive Vice President and Chief Lending Officer interacted daily with CEO Woodard. He did not "conspire" with Woodard. His undisputed testimony was that there were many loans where he and Woodard "disagreed" on banking decisions. Those disagreements were not involving "legality or illegality", but involved pure banking opinions.

Hounslow pleaded Not Guilty; he denied any "conspiracy" or criminal activity; and he was acquitted of all charges.

Stephen G. Fields, an Executive Vice President and Commercial Loan Officer, of necessity interacted daily with Woodard, Hounslow and other banking employees. He denied any "conspiracy", or criminal activity.

Troy Brandon Woodard, the son of Defendant Woodard, a Vice President and Mortgage Loan Specialist for a different employer. He did not work in the bank. He had no part with reference to "loans" or banking activities.

### D. Statement of Facts as to Brandon Woodard

Richard Baker was a commercial lender with the Bank of the Commonwealth (J.A. 1334). He approved the original loans to W.S. Summit to purchase and improve property in Lexington, Virginia and the renewal of those loans. He acknowledged that he endorsed the change in terms and conditions of the loan, including an increase in the loan amount and an adjustment to the interest rate (J.A. 1346-47).

Baker acknowledged that it was important that real estate taxes be paid on the property, acting as collateral for a bank loan, and that the bank's ability to do this on its own is set forth in the mortgage documents. Real estate could be paid and the amount added to the principal balance of the loan (J.A. 1381-1384).

Jed Sherman stated that in early 2005 he and Brandon Woodard formed a real estate business, the purpose of which was to purchase houses and renovate them for resale (J.A. 1409). They purchased property in Norfolk and Portsmouth, Virginia (J.A. 1410, 1422). They were not able to sell these properties, and listed

them for rent (J.A. 1422). The rental income did not meet expenditures and they were forced to contribute money out-of-pocket (J.A. 1423).

They also purchased a lot in Lexington, Virginia. At that time, the property was owned by Phil Miller, a real estate investor who was known to Sherman. The plan was to construct a house on the property for sale (J.A. 1425). They were not able to sell the house, so they rented it. The monthly rental payments for the house in Lexington did not cover the loan payments. They were forced to make up the difference from other loans that they had obtained in the Summit name. When this money was exhausted, they covered the difference personally (J.A. 1427-28).

Sherman said Brandon knew of Dennis Norton from Alabama. Norton agreed to become a third partner, and a new L.L.C. was formed. They had a five-year business plan for W.S. Summit, which included projections of expenses, anticipated income, etc. (J.A. 1484). The original plan was to purchase the properties, renovate them, and sell them. Norton was an experienced real estate investor and knew what he was doing. Sherman and Brandon relied on Norton's expertise with regard to the Alabama properties (J.A. 1490).Norton was going to manage the project since he lived in Alabama (J.A. 1430).

Sherman stated that the appraised value of the individual Alabama properties exceeded the loan amount. The loan-to-value ratios were 73%, 82%, 82%, 67%, 77%, and 59% (J.A. 1494-1497).

Ellen Cehrs-Tolliver worked for the Bank as a Senior Consumer Loan Offer (J.A. 1620). Brandon received a commission on two commercial loans (J.A. 1627-28). Typically the bank charged a 1% origination fee. However, the origination fee in connection with the loans that Woodard referred to the bank would be higher than 1%: half would go to the bank, and half would go to the mortgage company (J.A. 1631). The commission was added to the customer's charges. In effect, the borrower paid the commission, a portion of which was ultimately paid to Brandon (J.A. 1669).

Eric Menden and George Hranowskyj were business partners who dealt with the Bank of the Commonwealth.

Menden stated that Ed Woodard approached him and said that his son was involved in real estate deals and that he was having trouble making them work. Woodard asked if Menden could take them over (J.A. 1723). Menden said he did not negotiate the purchase price of the properties (J.A. 1725). Menden received a loan from the Bank of the Commonwealth for the purchase of the property (J.A. 1726). According to Menden, after they took over the property, the current tenant moved out and they found another tenant; however they were not able to keep current with the loan payments.

Brandon Woodard personally owned a condominium on York Street in Norfolk, Virginia, which Menden and Hranowskyj purchased. According to

Menden, they did not borrow mortgage money from the Bank of the Commonwealth for this purchase. They borrowed on other buildings in Norfolk, Virginia. According to Menden, they had difficulty finding a tenant for the property, and ultimately fell behind in payments (J.A. 1747). Thereafter, Menden and Hranowskyj borrowed $250,000.00 against the condo because it had no prior mortgage (J.A. 1748). Menden stated that the purpose of the $250,000.00 loan was to pay them back for the money that they had put out to make the purchase (J.A. 1751).

Ed Woodard also told him that Brandon wanted to sell property in Alabama. Menden and Hranowskyj traveled to Alabama to view the property (J.A. 1753). Ultimately, Menden and his partner decided not to buy the property. There was some discussion of another individual, Trey Pezzella, a physician, buying the property (J.A. 1757). Pezzella did not agree to purchase the property, and there were no further attempts to find another buyer (J.A. 1758).

Menden prepared a written statement at the time of sentencing intended to be presented to the Court. The statement recants his testimony and states that he never intended to harm the bank or join in any conspiracy (J.A. 2036). Menden acknowledged that there were no direct promises made to him (J.A. 2041-42). Menden acknowledged he was interviewed by FBI agents, and at that time he stated that he never forced to buy any properties from the bank, and that it was his

belief that he would receive favorable treatment if he helped the bank out (J.A. 2052). Menden stated that he gave money to Brandon Woodard so that Woodard could make loan payments. He also acknowledged that at that time he and Woodard were talking about forming a partnership in Tidewater, Virginia, which included three or more properties (J.A. 2081-82).

Menden acknowledged that in 2008 he had $20,000,000.00 in loans and that after that it went as high as approximately $40,000,000.00 (J.A. 2091). He acknowledged that three properties that he got from Woodard represented approximately $1,000,000.00. He then borrowed an additional $19,000,000.00 from the bank for other real estate investments (J.A. 2091). In 2008, Menden and his wife had a net worth of approximately $7,000,000.00 (financial statement dated December 2007). Menden acknowledged that he and George Hranowskyj personally guaranteed the loans from the Bank of the Commonwealth (J.A. 2095).

Menden acknowledged that he never told Brandon that he increased the loan on one of his buildings and used construction loan money on another building in order to purchase Woodard's condo (J.A. 2096). Furthermore, he stated he never told Brandon that he placed a $250,000.00 mortgage against the condo after it had been purchased (J.A. 2096-97). Menden stated that Ed Woodard never told him Brandon had problems keeping current on his condo (J.A. 2097-98). Menden acknowledged that he never told Brandon that he was structuring the purchase of

the condominium for cash, in order to avoid submitting a loan application to the bank (J.A. 2102). Menden acknowledged that Brandon never made any promises to him in return for his purchasing various properties (J.A. 2103-04). Menden acknowledged that he and his partners defaulted on the three loans in questions (J.A. 2105). Menden stated that when he took out the loans, he was not anticipating default (J.A. 2106).

George Hranowskyj acknowledged that he had entered a plea of guilty to conspiracy to commit bank fraud and conspiracy to commit wire fraud (J.A. 2127). He acknowledged that he had been business partners with Menden for approximately 15 years. At one point, their relationship with the Bank of the Commonwealth was $35,000,000.00 - $40,000,000.00 (J.A. 2130). Menden told him that Brandon had some property for sale, and that they would have the opportunity to purchase those properties. He saw an appraisal for the property (J.A. 2133). He heard about the property at 1502 Crawford Parkway in Portsmouth through Menden. He stated that Menden told him that Woodard owned the property and was having difficulty with it, and they would have the opportunity to purchase it. The property would be financed through the Bank of the Commonwealth with Steven Field as the lending officer (J.A. 2136). He stated that Simon Hounslow told him that Woodard and his partners had property that was

performing poorly and was interested in selling.  He stated that he had no personal discussions with Ed Woodard about the purchase of the property (J.A. 2139).

Hranowskyj stated that Menden told him that Woodard owned a condominium that he was interested in selling, and that he went to examine the property (J.A. 2141).  Hranowskyj said that the condo was purchased for cash, with the majority of the money coming from equity they had in an apartment building on Colonial Avenue in Norfolk. The settlement date was November 3, 2008 (J.A. 2147). The subsequent borrowing against equity in the condo was January 6, 2009 (J.A. 2155). Hranowskyj said that he was trying to get money for another project that they were working on and wanted to use the condo as collateral. Hranowskyj said that this loan was approved by the Board of Directors and an Executive Board. By 2010, their borrowing relationship was in the neighborhood of $35,000,000.00 to $40,000,000.00 (J.A. 2205).

Hranowskyj acknowledged that, as of the end of December 2007, he had a net worth of $7,000,000.00 and total assets of $21,200,000.00 (defense Exhibit 4249).

Hranowskyj identified joint properties owned by he and Menden. The document reflected rental income and monthly payments, which suggest that there was sufficient cash flow to meet debt service on the properties (J.A. 2253).  He also stated that he and Eric Menden were no longer partners, that he did not trust

Menden and believed that Menden embezzled $3,000,000.00 from him (J.A. 2308). Hranowskyj was questioned about a prior criminal case and a civil case, in which he committed perjury (J.A. 2309). Hranowskyj admitted that his testimony on cross examination was inconsistent with direct testimony.

Hranowskyj admitted that the price he paid for the property he bought from Woodard was in the ballpark, and did not complain about it to the bank (J.A. 2333). He stated that when it was brought to his attention that Woodard had certain properties for sale, he indicated that if he liked the properties, he would buy them (J.A. 2334). He stated that he liked the properties and that he paid a fair price. He was pleasantly surprised how nice most of the properties were when he examined them. When it was brought to his attention that there were other properties available in Alabama, he was interested because they were considered college properties, which are easy to rent based on his experience. He performed a cash flow analysis of the property in Alabama, and based on the analysis, he believed the numbers should have worked in terms of turning a profit (J.A. 2335-36). He stated that when he first looked at Woodard's condo, he did not buy it. When he did decide to buy, he thought the condominium could serve as collateral for future loans that he might need. The condominium was purchased as investment property (J.A. 2336). He liked the fact that there was no prior lien against the real estate, which would allow him to borrow money against it without

someone else being ahead of him (J.A. 2337). Hranowskyj said that he and Mr.
Menden had a falling out over his discovery that Menden had stolen several
million dollars from lines of credit that were set up as construction loans (J.A.
2339).

He admitted that he never talked to Ed Woodard about the purchase of the
Crawford Parkway, Carolyn Way, or Brandon Woodard's condo (J.A. 2353).

Hranowskyj admitted that, when considering the purchase of the Alabama
properties from Brandon, he believed that Mr. Menden could do a better job of
managing those Alabama properties because of his prior experience. He though it
was more likely that they could make this a profitable venture (J.A. 2365).
Hranowskyj admitted that when he asked Ed Woodard about lowering interest
rates if he purchased the Alabama properties, Ed Woodard was not receptive, and
actually walked out of the room (J.A. 2366 and 2368).

Kenneth J. Young was a member of the Board of Directors of the Bank of
the Commonwealth. He identified policies and procedures relative to extensions of
credit to insiders (Exhibit 1A-3, J.A. 3075).  He acknowledged that it was not
Brandon's duty as a seller to make any disclosures about these loans (J.A. 3371).
Young acknowledged that a commercial credit review of the borrowers' financial
situation would be taken into account in deciding whether or not to approve loans
(J.A. 3287).   Young acknowledged that no loans or adversely-classified loan

reports for Brandon showed up on the delinquent list as of November 2009 (J.A. 3358, 3362). Additionally, none of the properties that Brandon sold to Menden and Hranowskyj the year before appeared on the list (J.A. 3363). Young acknowledged in July 2010 that the bank gave Menden and Hranowskyj a $36,000,000.00 extension on 15 to 20 loans (J.A. 3374).

Robert L. White testified that he had been a Senior Vice President and commercial loan officer with the Bank of the Commonwealth (J.A. 3384). He testified that he had been involved to some degree in the approval process of loans to Brandon (J.A. 3388). He did not have any concerns about approving the loans for the Alabama properties initially (J.A. 3395). He stated that a credit review showed a loan to value ratio of 73 percent (J.A. 3460). He stated that was certainly within the banks underwriting guidelines and therefore the borrower did not need to make a down payment. He indicated that even though the loans were out of state they were ratified by the executive committee (J.A. 3462).

Thomas Dykes was Vice President for Administration for the Bank of the Commonwealth (J.A. 5447). He drafted a memorandum to allow all mortgage loan officers to become eligible for additional compensation for referring commercial loans to the bank, and to generate more business for the bank (J.A. 5464).

Dykes also wrote an anonymous letter to the board of directors (J.A. 5564). The letter specifically talked about Brandon being the only loan officer being given

the opportunity to receive commissions for commercial loans (J.A. 5527).  The anonymous letter was admitted to an audit committee for review and they subsequently determined that the complaint about Woodard was unfounded (J.A. 5526).

Cindy Jackson testified that she worked for Cindy Sabol, the Chief Financial Officer.  She discussed certain branch codes that were set up for Brandon.  The branch code was put in the system on a general ledger in order to track loans and fees associated with various loans (J.A. 5808).  She acknowledged that the branch codes were only in existence 28 to 48 hours before they were removed.  Nothing of significance was done with them.

Jackson was asked about the ownership of various banks.  She indicated Mr. Uppalapati, a director, owned Waves, Powell's Point, and Moyock Branch prior to becoming a director.  Subsequently the Powell's Point Branch was sold to Woodard as well as a 50% share of the Moyock Branch which was sold to Woodard by Eric Aviary, Mr. Uppalapati's, former partner. The Kitty Hawk Branch was owned by Commonwealth Property Associates, L.L.C.  Brandon was a 1% shareholder in that L.L.C.

There was an allegation that some of the leases were hid from the directors via the use of shell corporations.  However, a review subsequently showed that the allegations were without merit (J.A. 5839).

An anonymous letter had been sent to the bank referencing certain complaints. Jackson stated that the bank prepared a response. Mr. Garrett reviewed each of the complaints and determined that all the complaints that involved Brandon were without merit (J.A. 5849).

FBI Agent Moriarty acknowledged that Brandon was responsible for referring an $8,000,000.00 loan and a $4,500,000.00 loan to the bank, for which he received approximately $42,000.00 in commissions (J.A. 6426).

At the conclusion of the government's evidence, Brandon made a Rule 29 motion for judgment of acquittal on Counts 1, 16, 17, 18, and 26 (J.A. 6510). The court was concerned with whether or not the government had established that Brandon did anything to injure the bank (J.A. 6522) or whether he was engaged in some criminal act in getting the loans closed, i.e., Counts 16 – 18 (J.A. 6527). The court denied the motion with respect to Counts 1 and 26 and took the motion on Counts 16 through 18 under advisement (J.A. 6530).

Brandon testified on his own behalf. He, along with two friends, Jed Sherman and Dennis Norton, formed W.S. Summit, LLC, a real estate investment company. In 2006, they purchased 40 Carolyn Way and 1502 Crawford Parkway with loans from the Bank of the Commonwealth. In 2008, both properties were sold to Menden and Hranowskyj for less than market value (J.A. 9177, 9179-80, 9182-84).

Brandon personally owned a condominium on York Street, Norfolk, Virginia, which he purchased in 2004 for $345,000.00 with a mortgage from SunTrust mortgage and $74,000.00 borrowed from his father (J.A. 9188-89). At the time of the sale, Woodard had an appraisal in the amount of $415,000.00, which he believed accurately represented the value of the property (J.A. 9190). Woodard denied making a profit from the sale in the amount of $69,484.26, as this represented a return on his down payment (J.A. 9399-9400).

Brandon knew that the purchase would be for cash, although he did not know that the money was coming from the bank (J.A. 9193).

Brandon stated that prior to 2008 he individually or through W.S. Summit, LLC borrowed money from the Bank of the Commonwealth to invest in other real estate properties to be held for investment. The properties were purchased, rehabilitated, and either sold at a profit or rented. According to Brandon, approximately five to ten properties were involved. He made money on some, lost money on others. According to Brandon, all loans were repaid at sale (J.A. 9196-9203).

Starting in 2005, Brandon and his partners purchased properties in Alabama which they felt were reasonably priced. One of the partners, Dennis Norton, was an experienced real estate developer. Brandon visited properties that Norton had owned in Texas and in Alabama (J.A. 9205). Brandon stated that they bought six

properties near a medical school and college, which they assumed would be easy to rent.  They conducted due diligence prior to making the purchases.  At the time, Dennis Norton was living in Birmingham, and he was responsible for managing the properties and to watch over construction and repairs.

Brandon stated that at some point he was informed by Dennis Norton that the real estate taxes had not been paid on the properties (J.A. 9228).  Brandon stated that he had already put approximately $50,000.00 into the project and that his partners were not making an equal contribution.  Consequently, he asked the bank if they could borrow an additional $53,000.00 to pay taxes, which the bank agreed to do (J.A. 9229).

The proposed sale of the properties to Pezzella was intended to be an assumption, whereby Brandon and the others would remain obligated on the loan for a period of two years (J.A. 9257).

Woodard stated that he believed that he and Sherman qualified for the loans since the loan application had gone through all the normal banking channels and had been approved by the bank (J.A. 9359).  Brandon stated that Sherman and Norton wanted to invest in other properties; however, he was not interested.  He explained that e-mails between the parties indicating that there was a problem at the bank did not refer to an investigation arising from Mr. Tom Anderson's shareholder complaint, but rather the fact that Summit was falling behind on loan

payments, despite the fact that he was doing his best to keep payments current (J.A. 9360-9361).

Regarding the Alabama properties, Brandon acknowledged that Summit fell behind in the payment of real estate taxes, and as a result, properties were sold at auction (J.A. 9405). He acknowledged that he invested $50,000.00 of his own funds into the project and that Norton stated that he invested over $80,000.00 in the project (J.A. 9408).

Brandon acknowledged that he received $69,484.26 from the sale to Menden and Hranowskyj. However, he stated that he had made a cash down payment of $74,000.00, and that the return was less than his investment (J.A. 9400).

At the conclusion of all evidence, Brandon renewed his Rule 29 motion, particularly with regard to Court 16, 17, and 18 - Unlawful Participation in a Loan. Brandon alleged the government failed to prove intent to injure or defraud the bank (J.A. 9834).

In ruling on the Rule 29 motion, the court stated:

"[T]he court deliberated at length with respect to the counts stated by Troy Brandon Woodard. The court had raised some questions about these unlawful participation counts at the end of the government's case, and on further evaluation the court finds that there are some issues raised, some issues of creditability, and other issues that prevent the court from granting a Rule 29 motion, so the court

declines to grant a Rule 29 motion on any of the counts respecting to Troy Brandon Woodard, so the motion is denied." (Page 6)

The matter was presented to the jury. Brandon was found guilty of Counts 1, 16, 17, and Brandon renewed his motion in writing. The government filed a response pleading and Woodard filed a reply. Brandon also requested a hearing on his motion, but the record does not reflect that his request was ruled upon. The court then filed its Memorandum Opinion.

## SUMMARY OF THE ARGUMENT

### By Appellant Stephen Fields

On multiple occasions, the district court committed reversible legal error by excluding admissible defense evidence that went to the heart of the defense case. In all instances save one, the court's ruling was predicated on a clearly erroneous view of the law of evidence:

I.   Under the hearsay rule, the district court's exclusionary rulings were based upon the legally mistaken premise that an out-of-court statement constitutes hearsay when it "supports the defense," whereas in fact the statements were offered for permissible non-hearsay purposes material to the *mens rea* defense, and thus were not hearsay as defined by the rules. *See* Fed. R. Evid. 801(c). The basic ruling

appears at Tr. 4/26/2013 at 6924-27, and the same ruling was repeated on more than 20 occasions.

Under the law of cross-examination, the district court's exclusionary rulings were based upon the legally mistaken belief that government witnesses could not be questioned about "uncharged misconduct." (Tr. 4/1/2013 at 1896-98). The controlling rule of evidence expressly permits such inquiry "if probative of the character for truthfulness or untruthfulness of . . . the witness," Fed. R. Evid. 608(b)(1).

Under the law of relevance, the district court's exclusionary rulings were based upon a misapplication of Rule 401's basic definition of relevance, as applied in a conspiracy case. (see, e.g., Tr. 3/28/2013 at 1557)(excluding evidence outside conspiracy time period); (Tr. 4/17/2013 at 4972).(excluding evidence of industry practices). The court's rulings also were inconsistent with the government's own allegations in the indictment, which referred to the pre-conspiracy period and alleged that the Bank's practices were "unsafe and unsound" by industry standards.

Although the constitution guarantees defendants the right to testify in their own defense, the district court in this case prevented Mr. Fields from completing his direct testimony. It arbitrarily allowed Mr. Fields only seven-and-a-half hours, without any advance warning, even though the Government had more than six

weeks to put on its case in chief, and Mr. Fields still had a substantial amount of transactions to explain. (Tr. 5/8/2013 at 8770-73)

II.   The district court also committed clear legal error by ruling that a Government witness who openly admitted to using specialized training and knowledge to give her testimony did not testify as an expert. The governing rule provides exactly the opposite:  that lay opinion testimony may not be "based on scientific, technical, or other specialized knowledge," Fed. R. Evid. 701(c), and that provision was added in 2000 to prevent precisely the type of evasion insisted upon by the government and permitted by the court here.   3544-3645, 3646, 3657.

III.  All of the foregoing errors are fully preserved both on the record at the time of filing, and through trial briefs submitted to the district court on each point. (Dkt. 319)(preventing cross-examination of Menden and Hranowksyj); (Dkt. 328)(admissibility of pre-2008 evidence); (Dkt 337)(improper admission of expert testimony by Lori Williams); (Dkt 378)(memorandum on the hearsay rule); (Dkt 395)(improper limitation of Stephen Fields's direct testimony).

Even under ordinary evidence law, any of the foregoing errors alone requires a reversal. Each error affected evidence that was material to the jury's determination of guilt, and none can be said to be harmless.

Moreover, both individually and collectively, the district court's erroneous rulings on evidence deprived the defendant of his constitutional rights to present a

defense and his right to a fair trial.  What the defendant received was a palpably unfair trial in which only the Government's side was presented.  Accordingly, the guilty verdicts are defective, and the judgment below must be reversed.

## By Appellant Edward Woodard

The district court erred in determining that the evidence was sufficient to support the Judgments of conviction of Woodard on all counts. (Argument I).  The district court furthered erred in refusing to admit testimony of witnesses and exhibits relevant to the National Financial Crisis of 2008-2012 and its relationship to the Bank of the Commonwealth.   (Argument II). The district court erred in refusing to admit testimony of witnesses and exhibits relevant to the $700 Billion United States Government's Troubled Asset Relief Program ("TARP") of October 3, 2008 ("the bank's Bail out Bill") and its relationship to the Bank of the Commonwealth. (Argument III)

## By Appellant Brandon Woodard

1.    Brandon challenges the sufficiency of the evidence on Count 1, Conspiracy to Commit Bank Fraud in violation of 18 U.S.C. § 1344.  There was no single scheme alleged as to all defendants.  With regard to Brandon, the evidence did not show that he employed false or fraudulent pretenses to deceive the bank.

18 U.S.C. §1344(2).  Further, there was insufficient evidence to show that Brandon intended to defraud the bank. 18 U.S.C. §1344(1).  His actions were intended to benefit his position rather than injure the bank.

2.  Brandon challenges the sufficiency of the evidence on Counts 16 – 18, Unlawful Participation in a Loan, 18 U.S.C. § 1005.  The district court failed to rule on Woodard's Rule 29 motion at the conclusion of the government's evidence. The evidence was insufficient to establish that Brandon benefitted from a loan with the intent to defraud the bank.  His actions were intended to benefit his own position.

3.  The district court abused its discretion in calculating the loss attributable to Brandon.  The loss associated with the Suffolk branch was not the result of any bank-related conduct.  Other losses charged to Brandon were unforeseeable and unrelated to his individual conduct.

4.  The district court abused its discretion by finding that Brandon violated a position of trust.  Brandon submits that he did not hold a position of trust with the bank, and therefore could not abuse a position of trust.


## ARGUMENT BY STEPHEN FIELDS

### STANDARD OF REVIEW

Evidentiary rulings in the district court are generally reviewed for abuse of discretion. *United States v. Moore*, 27 F.3d 969, 974 (4th Cir. 1994). In this case, however, the district court's rulings under the hearsay and relevance rules, as well Rule 608(b), were all based upon an erroneous understanding of the applicable law, which by definition is an abuse of discretion. *See United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007) ("A district court abuses its discretion when it…relies on erroneous factual or legal premises.")(internal citations omitted). Likewise, the district court's admission of unqualified expert testimony is in direct violation of Rule 701(c), and therefore constitutes an abuse of discretion as a matter of law. Because all of the foregoing rulings are based on erroneous legal premises, the standard of review is therefore *de novo*. *United States v. Lavabit, LLC*, 749 F.3d 276, 285 (4th Cir. 2014). The remaining ruling under challenge-- the district court's truncation of the defendant's own testimony--involves a degree of discretion, but is being challenged as an abuse of discretion because it was arbitrary and disproportionate. *Delfino*, 510 F.3d at 470.

## I. THE DISTRICT COURT COMMITTED MULTIPLE ERRORS IN EXCLUDING DEFENSE EVIDENCE AT TRIAL.

The right to put on a defense includes "the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S.

39, 56 (1987). This right was undermined by the district court's rulings excluding evidence that would have supported Mr. Fields's defense.

**A.    The district court misapplied the hearsay rule to exclude defense evidence.**

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c); *United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007). When an out-of-court statement is offered for some other purpose—such as to show: the effect on the hearer, *see United States v. Galloway*, 459 Fed. Appx. 232, 233 (4th Cir. 2011)(statement by informant admissible to explain why officers went to a specific location."), intent, notice, or knowledge, *see United States v. Levy*, 335 Fed. Appx. 324, 328 (4th Cir. 2008)(customer complaints admissible to show intent, lack of mistake, and notice), the declarant's state of mind, *see United States v. Harris*, 733 F.2d 994, 1004 (2d. Cir. 1984)(defendant's out-of-court statement admissible to show what he believed), or a verbal act, *see e.g., United States v. Continental Casualty Co.*, 414 F.2d 431, 434 (5th Cir. 1969)("inquiry is not the truth of the words said, but merely whether they were said")—then the statement does not meet the definition of hearsay and is not excluded by the hearsay rule. This is such a bedrock, and basic, premise of American law that it qualifies as a truism.

The district court failed to grasp this definition, believing instead that a statement constitutes hearsay whenever it "supports the defense," as shown through its statements made over the course of trial. (Tr. 4/26/2013 at 6924-27)("It is offered for the truth of the matter asserted because it's offered to confirm the defense that the defendant is raising.");[3] (Tr. 4/12/2013 at 4287-88)("because to the extent it's offered to get into something that's supportive of Mr. Hounslow's position of defense, it violates the rule"); (Tr. 4/19/2013 at 5528-29)("it's obviously offered to support or assist the defendant in the defense he wishes to raise by challenging the credibility of the witness").

Based on its erroneous construction of the hearsay rule, the district court excluded numerous lines of testimony and evidence offered to support the defense theory, including the following:

1) Statements from the borrowers, offered to show Mr. Fields's beliefs about the purpose of the loans, the identity of the "true borrower," or the borrower's ability to repay. (Tr. 5/8/2013 at 8639)(excluding testimony that an alleged nominee borrower told Mr. Fields "she needed some money for a loan to finish her house in Chesapeake, Virginia."); (Tr. 5/8/2013 at 8806-07)(excluding Tom Arney's statement to Mr. Fields regarding a loan for the purchase of two antique cars); (Tr. 5/8/2013 at 8812-13)(excluding Tom

---

[3]   Two days after this exchange, Mr. Fields's counsel filed a trial brief explaining the hearsay rule to the district court. (*See* Dkt. 378, filed 4/29/2013). In a five-page brief, Fields's counsel stated that "it is crucial that Mr. Fields be allowed to present evidence regarding what he was told by key players in this case and how those statements affected his intent, state of mind, and knowledge" (*Id.* at 1), and cited numerous cases demonstrating the correct application of the hearsay rule. Unfortunately, the district court adhered to its previous ruling.

Arney's statement to Mr. Fields regarding wanting his children to purchase property); (Tr. 4/30/2013 at 7243-44; DTX 5108)(excluding an email from George Hranowskyj describing the amount of tax credit money available to repay the loans);

2)  Statements from Mr. Fields, offered to show his beliefs and expectations. (Tr. 4/2/2013 at 2248)(excluding testimony of whether Mr. Fields trusted George Hranowskyj); (Tr. 4/1/2013 at 1936-37)(excluding testimony that Stephen Fields told Eric Menden the economy would be getting better);

3)  Statements offered to show good faith and the lack of a conspiracy. (Tr. 4/1/2013 at 1941-42; 4/3/2013 at 613)(excluding testimony that Mr. Fields told Menden and Hranowskyj to not purchase property from Brandon Woodard); (Tr. 4/1/2013 at 1961)(excluding testimony that Mr. Fields frequently called Menden to check on the status of a construction project);

4)  Statements offered to show that employees at the Bank, including Mr. Fields, engaged in due diligence to verify the borrowers' ability to repay. (Tr. 4/30/2013 at 7271-72; DTX 5037)(excluding emails from Mr. Fields wherein he asked third parties about the structure and amount of funds available to the borrowers); (Tr. 4/2/2013 at 2260)(excluding testimony that a contractor hired to help Stephen Fields had requested Hranowskyj provide more information to perform a global cash flow analysis);

5)  Statements offered to show lack of notice and intent, and to support the defense theory that the alleged "unsafe and unsound" banking practices were well-known throughout the Bank.   (Tr. 4/30/2013 at 7268-67, 7352) (excluding testimony that the internal auditor, who knew about the banking practices, never claimed that these practices violated bank policy or constituted fraud)(Tr. 4/30/2013 at 7352); (Tr. 4/15/2013 at 4506-07, 4536)(excluding testimony that one employee vocally complained about overdrafts to pay loans); (Tr. 5/8/2013 at 8682)(excluding testimony of what the board of directors told Mr. Fields after he presented an action plan to remove Tom Arney from the past-due list);

6)  Statements offered to show that employees at the Bank, including Mr. Fields, understood transactions authorized by the Bank's President were always proper. (Tr. 5/7/2013 at 8502-03)(excluding testimony that the Bank's internal auditor told Mr. Fields that Edward Woodard has the "magic

pen" to override any bank policy); (Tr. 4/15/2013 at 4501)(excluding testimony that Bank employees are instructed to follow Edward Woodard in light of his management override powers);

7) Statements offered to explain why Mr. Fields did not include certain information on credit memoranda he prepared. (Tr. 5/8/2013 at 8722-23)(excluding what Ed Woodard told the executive committee regarding his ownership of a condominium unit purchased by Tom Arney[4]).

8) Statements offered to rebut the Government's allegation that Mr. Fields received a bribe. (Tr. 4/1/2013 at 1965 (excluding testimony that Mr. Fields asked Menden for a receipt); (Tr. 5/7/2013 at 8468)(excluding testimony that no one ever told Mrs. Fields the granite countertops would be free).

While the foregoing statements were clearly admissible for non-hearsay purposes, the district court erroneously excluded these statements because they "supported the defense." The district court's failure to understand the hearsay rule was harmful, because it prevented the jury from considering a substantial amount of evidence supporting Mr. Fields's *mens rea* defense. *See United States v. Leake*, 642 F.2d 715 (4th Cir. 1981)(reversal for exclusion of out-of-court statement offered to support a *mens rea* defense); *United States v. Ibisevic*, 675 F.3d 342 (4th Cir. 2012)(same).

### B.    The district court misapplied Rule 608(b) to prevent proper cross-examination of two prosecution witnesses.

---

[4]    With respect to this transaction, the Government alleged that Mr. Fields intentionally concealed the fact that the loan was for a borrower to purchase Edward Woodard's condo.  The defense theory is that Mr. Fields did not need to tell the committee, because Edward Woodard had already done so. The court's erroneous ruling thus impacted both defendants.

Eric Menden and George Hranowskyj were two key prosecution witnesses against Mr. Fields at trial. Both men were Mr. Fields's clients at the Bank, and borrowed substantial sums of money. After pleading guilty to an unrelated historic tax credit fraud, as well as the instant conspiracy, these two individuals testified against Mr. Fields pursuant to their plea agreements.

The testimony of Menden and Hranowskyj was especially important to the Government for several reasons. First, they—like Tommy Arney—were the only individuals who made allegations regarding Mr. Fields' knowledge. For example, Eric Menden claimed that he had discussions with Mr. Fields regarding inflated construction draw requests for the 345 Granby Street project (Tr. 4/1/2013 at 1835), that he supposedly forged his wife's signature in Stephen Fields's office (Tr. 4/1/2013 at 1851-52), and that he was asked by Mr. Fields to purchase Brandon Woodard's properties (Tr. 4/1/2013 at 1724) and Bank foreclosure properties (Tr. 4/1/2013 at 1792-93).

More importantly for Mr. Fields, both Menden and Hranowskyj claimed that they gave Mr. Fields a set of free granite kitchen and bathroom countertops, worth about $6,000. This was the only gratuity that Mr. Fields allegedly received in seven years at BOC, and it was a vigorously contested issue at trial: both Mr. Fields and his wife testified that they paid for the countertops, while Menden's and Hranowskyj claimed that it was a gratuity. Their credibility was critical to the

Government's case, especially in view of the fact that the only defendant who was not alleged to have received a gratuity—Simon Hounslow—was acquitted of all charges by the jury.

Mr. Fields's counsel sought to show the jury that Menden and Hranowskyj were more than seasoned liars and experienced con-artists: they had a repeated history of perjury, fabricating evidence, and meticulously corrupting the judicial process. Discovery documents produced by the Government showed that in 2008, a female employee filed a sexual harassment claim against Hranowskyj. To defend themselves in the civil suit, Menden and Hranowskyj broke into the employee's home, stole evidence, and destroyed it. (Tr. 4/2/2013 at 2227). They then concocted a false criminal charge, and swore out a false criminal complaint, causing her to be criminally prosecuted. (*Id.*) In connection with both the civil and criminal proceedings, they created false documents, fabricated evidence-- including removing a door from their office to support perjured testimony, committed perjury personally, and instructed their employees to give perjured testimony. (Tr. 4/1/2013 at 1897).

The foregoing conduct was relevant to character for truthfulness under Rule 608(b). However, Mr. Fields was prevented from developing this point on cross-examination because the district court, misdirected by the prosecution, labored under an erroneous impression that "uncharged misconduct" cannot be the subject

of cross-examination. (Tr. 4/1/2013 at 1896-98)(stating that "you can't impeach on uncharged misconduct."). Mr. Fields' counsel explained that he only needed 10 minutes to finish his cross-examination on this point, and sought to proffer what the additional cross-examination would have revealed. (Tr. 4/1/2013 at 1898). The district court, however, was unwilling to even entertain the proffer. (*Id.* at 1898-1900).

Mr. Fields's counsel filed a bench memorandum that night addressing Rule 608(b). (Dkt. 319). The next morning, Mr. Fields's counsel explained that George Hranowskyj, who was testifying after Eric Menden, "engaged in the same acts of perjury as Mr. Menden," and "burglarized [an employee's] home, took the evidence, burned the evidence, and then [] concocted a criminal claim against her to allege she had stolen money." (Tr. 4/2/2013 at 2227). He proffered that "George Hranowskyj also created false documents to give himself an alibi in a civil trial" and explained that one of the issues in this case is whether certain documents were genuine (Tr. 4/2/2013 at 2228). In response, the district court indicated that it would permit some questions regarding "prior instances of untruthfulness" but would not permit defense counsel to "go[] into the nuts and bolts of every bad act of a witness." (Tr. 4/2/2013 at 2010). When counsel began cross-examining George Hranowskyj regarding these prior instances of misconduct, however, the district court again prevented him from developing any of the points except in the

most general terms—*e.g.*, whether he had previously lied under oath.   (Tr. 4/3/2013 at 625-626). As a result, the jury did not hear the full extent of deceptive and shocking conduct that Eric Menden and George Hranowskyj previously engaged in, that would have been clearly probative of their character for truthfulness.

Evidence Rule 608(b) permits the cross-examiner to impeach a witness by asking the witness questions relating to "specific instances of conduct . . . to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b).  As one court put it, "[n]othing could be more probative of a witness's character for untruthfulness than evidence that the witness has previously lied under oath." *United States v. Whitmore*, 359 F.3d 609, 620 (D.C. Cir. 2004)(holding that it was error to prohibit cross-examination regarding the witness's prior instance of perjury).

This Court identified other "instances of misconduct that are 'clearly probative of truthfulness or untruthfulness'" including "perjury, fraud, swindling, forgery, bribery, and embezzlement." *United States v. Leake*, 642 F.2d 715, 718 (4th Cir. 1981)(internal citations omitted). While a district court has "broad discretion" to limit the extent of cross-examination under Rule 608(b), its discretion must be based on the proper factors, including: "(1) the importance of the [witness's] testimony to the government's case, (2) the relevance of the conduct

to the witness's truthfulness, and (3) the danger of prejudice, confusion, or delay raised by evidence sought to be adduced." *Leake*, 42 F.2d at 719.  The probative value of the cross-examination must be *substantially* outweighed by a danger of unfair prejudice, confusion, or delay to justify exclusion. *United States v. Custis,*, 988 F.2d 1355, 1359 n. 1 (4th Cir. 1993)(holding that Rule 608(b) is governed by the standards set forth in Rule 403)(citing Fed. R. Evid. 608 advisory committee's note).

Ultimately, the right to cross-examine is protected by the Confrontation Clause of the 6th Amendment. "A defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to…'expose to the jury the facts from which jurors…could appropriately draw inferences relating to the reliability of the witnesses.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 679-80 (1986).  *See also Olden v. Kentucky*, 488 U.S. 227, 231 (1988).

In this case, the intended cross-examination would have taken only ten minutes, (Tr. 4/1/2013 at 1898), and the Government never disputed the nature of the underlying conduct. The facts underlying Menden and Hranowskyj's conduct would have exposed their true character to the jury. The district court prohibited the defense from developing this point on the basis that "[defense counsel] cannot impeach based on uncharged misconduct." (Tr. 4/1/2013 at 1897). Because the

district court relied on an erroneous interpretation of Rule 608, rather than the proper factors identified under Rule 403 and outlined in *United States v. Leake*, it abused its discretion.  *See also United States v. Smith*, 1991 U.S. App. LEXIS 15112 at 7 (4th Cir. 1991)(finding error for district court to prevent cross-examination on the basis that there was no prior conviction).

The error was harmful. The crucial importance of attacking the credibility of these lying witnesses is that theirs was the only testimony to support the government's *quid pro quo* theory as to Mr. Fields.  If the jury had discredited these witnesses' testimony, there may well have been no guilty verdicts against Mr. Fields at all, as was the case with his co-defendant Hounslow.

### C.    The district court misapplied the relevance rule to exclude defense evidence.

In multiple instances, the district court arbitrarily excluded defense evidence by holding that evidence was not relevant because it was not in the indictment.  A chief example is the district court's view that evidence from outside the time period of the alleged conspiracy[5] was irrelevant.  Another example is the district court's ruling that industry practices (*i.e.*, practices of other community banks) were "irrelevant."

### 1) Exclusion of pre-2008 evidence.

---

[5]    According to the indictment, the alleged conspiracy operated from 2008 to 2011.  Several substantive counts date back to 2006.

The district court generally treated any defense evidence as "irrelevant" if it fell outside the time period alleged in the conspiracy or an individual count. (*See, e.g.*, Tr. 3/28/2013 at 1557)(ruling that bank examination reports from 2000 to 2004 were irrelevant); (Tr. 4/4/2013 p. 2827-28)(excluding document because it was from 2006); (Tr. 4/8/20013 p. 3208)(excluding evidence regarding Bank's lending policy before 2008); (Tr. 4/17/2013 p. 4938)(permitting evidence from 2006 only because it was alleged by the Government in the indictment); (Tr. 5/8/2013 p. 8547)(same).

One critical category of evidence excluded on this ground were prior bank examination reports and a 2012 material loss report prepared following the Bank's failure. The district court prevented Mr. Fields from using these reports during the cross-examination of a bank examiner. (Tr. 4/22/2013 at 5782-83; DTX 8527 and DTX 8531). The district court also refused to admit a 2006 bank examination report which Mr. Fields sought to introduce during his direct testimony. (Tr. 5/8/2013 at 8546-07; DTX 5419).

These reports, had they been admitted, would have shown the jury that the Bank had long had problems with inadequate loan documentation (DTX 8527 at 4, 5-7), lack of a formal control process for construction loan disbursements (DTX 8527 at 8-14), and inaccurate past-due reports (DTX 5419 at 12), well before the alleged conspiracy began. This evidence was crucial to rebut the Government's

allegation that the practices developed from a "*quid pro quo*" relationship in which the defendants gave loans to unqualified borrowers without regard to bank policy.

The reports further showed that these problems were known to bank examiners and to the Board of Directors, consistent with the defense theory that Mr. Fields lacked any intent to defraud, conducted his transactions openly, and did not try to hide anything. The reports similarly showed that the Board was aware certain borrowers like Tom Arney had been classified as "special mention" assets as early as 2006, (DTX 8527 at 16),[6] a fact which would have demolished the Government's theory that Mr. Fields had a motive to conceal, or did conceal, bad loans from the Board.

Likewise, the district court excluded a 2007 commercial credit review prepared by Mr. Fields, which recommended extending due dates on eleven loans to Arney. (Tr. 5/8/2013 at 8587, DTX 4752). These extensions were approved by the board of directors, and were examples of the use and approval of CITAs prior to the alleged conspiracy period. Again, this evidence undercuts the Government's theory that instruments like CITAs were mere "sweetheart deals" in a conspiracy

---

[6] We note that this is the same basis for the FDIC's recent civil suit against the former directors of the Bank. The Complaint from that case alleges gross negligence against the Bank's directors for, *inter alia*, approving loans to borrowers whom they knew had no ability to repay. *See* FDIC v. Woodard *et al.*, Case No. 2:14-CV-471 (EDVA 2014)(Dkt. 1). Of course, if that allegation is true, then Mr. Fields could not have deceived the board of directors about the financial status of his borrowers, as the Government alleged at trial.

to defraud the Bank.  (Tr. 5/8/2013 8687-88).    Furthermore, as Mr. Fields's trial counsel explained, the commercial credit review showed that a company called RA Investments was a related interest for Tom Arney. At trial, the Government alleged that RA Investments was a nominee borrower for Tom Arney, and that their relationship was hidden from the board of directors. The excluded document was evidence that directly contradicts the Government's theory, because the Board, reading the report, would have known the relationship between RA Investments and Tom Arney.  (Tr. 5/8/2013 at 8688).

Finally, the excluded material loss report would have shown that the Bank failed as a result of inherent weaknesses in the organization's corporate governance and a decline in the real estate market. (DTX 8531 at 1, 2, 10). The Government highlighted the Bank's failure during opening (Tr. 3/21/2013 at 13, 46), during closing (Tr. 5/15/2013 at 4), and in the indictment (*See* Indictment at 4). The Bank's failure was implicitly used as evidence of fraud. The conclusions in the material loss report would have rebutted this inference.[7]

> **2) Exclusion of evidence about other community banks' practices during the recession.**

---

[7]    While the district court denied a defense motion to strike surplusage relating to the Bank's failure and initially ruled that the Indictment would not be shown to the jury (Tr. 5/2/2013 at 7916), it later changed its mind and sent the Indictment to the jury. As a result, the Government was permitted to rely on the Bank's fraud as circumstantial evidence of a fraud, while the defense was precluded from rebutting that point.

Mr. Fields was prohibited from eliciting any testimony during his cross-examination of a bank examiner about whether other community banks engaged in the same banking practices around the same time that the alleged conspiracy happened. The district court simply stated that this question was "irrelevant" without any qualification. (Tr. 4/17/2013 at 4972).

Evidence of industry practices—*i.e.*, the banking practices among community banks—was relevant to intent. The Government's case depended chiefly on persuading the jury that the Defendants used illegitimate banking practices to hide bad loans and extend credit to troubled borrowers. (Tr. 5/15/2013 at 71). In contrast, the defense argued that these practices were merely tools used by loan officers (including Mr. Fields) to accommodate an exceptionally severe economic recession.

The district court allowed the Government to present witnesses who characterized the challenged banking practices as contrary to industry norms. (See, e.g., Tr. 3/25/2013 at 37)(capitalization of interest); (Tr. 4/4/2013 at 2761)(funding loans without current real estate appraisal); (Tr. 4/9/2013 at 3420)(overdrawing checking accounts to pay interest); (Tr. 4/16/2013 at 4872 et seq.)(various "unsafe and unsound" practices). It was especially prejudicial to then prohibit the defense from introducing evidence bearing on the prevalence of those banking practices. If the jury had known that banks other than BOC relied on the same practices to keep

their customers afloat during the recession, they may well have concluded that Mr. Fields was acting in good faith and was not in a conspiracy to defraud the BOC.

### 3) Exclusion of evidence regarding Stephen Fields' decision to retain certain underperforming loans despite opportunity to remove them completely.

During Mr. Fields's direct testimony, his counsel sought to introduce evidence that in 2009, Mr. Fields was assigned the task of selling off non-performing loans at BOC, and chose not to sell the loans associated with Arney, Menden, and Hranowskyj.   (Tr. 5/8/2013 at 8873).  Again, the district court excluded this evidence as "irrelevant."  (Tr. 5/8/2013 at 8836-37). The evidence would have shown the jury that Mr. Fields's actions were inconsistent the behavior of a person involved in a fraud conspiracy.  If Mr. Fields's motive was to hide non-performing loans, a key and oft-repeated Government allegation, he would have chosen to get rid of these loans at the first opportunity through a legitimate process. (Tr. 5/8/2013 at 8873).  By excluding this evidence, the district court prevented the jury from hearing yet another piece of evidence supporting Mr. Fields's defense.

### 4) Exclusion of expert testimony providing background information about the banking industry.

Prior to trial, Mr. Fields provided a Rule 16 notice to the Government and the district court that the defendants intended to offer William Purcell as an expert in commercial banking to testify on a variety of matters relating to the commercial lending market and the response of banks to the recession in 2007.   (Expert Witness Disclosure, Dkt. 258, filed 3/5/2013).  The Government did not object to the proposed testimony until minutes before Mr. Purcell was called to the stand. (Tr. 5/2/2013 at 7911-12).

Despite the lack of any prior notice of objection, the district court excluded most of Mr. Purcell's proposed testimony on relevance grounds,[8] including opinions about the expansion of real estate lending from 2004 to 2006, the flood of capital in commercial real estate lending, the prevalence of commercial and residential real estate loans that were bad credits in hindsight, and the fact that one in three banks with a construction loan concentration similar to what was found at BOC failed during the economic crisis. (Tr. 5/2/2013 at 7921-23).[9]

---

[8]    The Notes of Advisory Committee to Rule 16 states: "The pretrial stage is also the time during which many objections to the admissibility of types of evidence ought to be made. Pretrial disclosure ought, therefore, to contribute…to a pretrial resolution of admissibility questions."

[9]    These same background facts were featured in the indictment, as well as the FDIC's recent Complaint against the Bank's board of directors. Clearly, the Government attorneys who drafted these documents believed that the information was relevant to understanding the underlying claims.

The opinions regarding expansions in the real estate market and the flood of capital in real estate lending were relevant for the jury to understand the defendant's actions during the alleged conspiracy. (Tr. 5/2/2013 at 7912). The indictment features multiple paragraphs discussing BOC's rapid growth from 2005 to 2009, and the Government characterized it as a period of "reckless" lending activity. The proposed expert testimony would have addressed that growth and provided context for the jury to understand that history.[10] (*Id.*). The same testimony would also have supported the defense that "during the run-up in the economy there were certain banking practices that were used and only later after the economy turned down were deemed unsafe and unsound." (*Id.* at 7917).

With respect to Mr. Purcell's opinions about bank failures, this testimony was intended to negate any inference of fraud or criminal wrongdoing that the jury may draw as a result of the Bank's failure. As previously discussed, the Government highlighted the Bank's failure in the indictment, opening statement, and closing arguments. Additionally, the Government elicited testimony regarding the loss from loans involving the defendants, and emphasized this fact repeatedly at closing argument. (*See, e.g.,* Tr. 5/16/2013 at 8, 27, 53, 58; Tr. 5/17/2013 at 460, 461). Clearly, the Government treated the loss from these loans and the

---

[10]    As noted in footnote 7, the district court initially said the Indictment would not be submitted to the jury, but later changed its mind. (Tr. 5/2/2013 at 7916).

Bank's failure as circumstantial evidence of fraud. Mr. Purcell's opinion would have provided an alternative explanation: the Bank failed as a result of its over-reliance on commercial real estate loans.

### 5) The district court's relevance rulings were an abuse of discretion.

The district court's crabbed view of relevance cannot be squared with the text of Rule 401 or with case law, and therefore is reversible legal error. *See Delfino, supra*; *United States v. Jones*, 554 Fed. Appx. 460 (6th Cir. 2014)(district court committed legal error by treating evidence of a co-defendant's history and reputation for violence as "irrelevant" where the defendant was raising duress).

Federal Rule of Evidence 401 defines relevant evidence as evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Rule 401 is intended to be a rule of admission, and presents a "low barrier to admissibility." *United States v. McFadden*, 2014 U.S. App. LEXIS 9432 at 21 (4th Cir. 2014)(citing *United States v. Leftenant,* 341 F.3d 338, 346 (4th Cir. 2003)).

In the context of conspiracy, this Court and others have consistently held that relevant evidence is not confined to the dates of the conspiracy alleged in the indictment. *See*, *e.g.*, *United States v. Kennedy*, 32 F.3d 876, 885-86 (4th Cir. 1994)(evidence of drug activities prior to charged conspiracy admissible to provide

"context" and to "complete the story of the crime"); *United States v. Hudson*, 462 Fed. Appx. 357, 359 (4th Cir. 2012)(unpublished)(evidence pre-dating conspiracy admissible because it "provided context for the jury to better understand the nature of the conspiracy"); *United States v. Henderson*, 58 F.3d 1145, 1151 (7th Cir. 1995)(conduct occurring before alleged dates of conspiracy admissible to show defendant's knowledge and intent); *United States v. Russell*, 134 F.3d 171, 183 (3d. Cir. 1997)(admitting evidence of acts that predate the dates "cited in the indictment as the beginning of the conspiracy."); *United States v. Diaz*, 878 F.2d 608, 616 n.2 (2d. Cir. 1989) ("[O]therwise relevant evidence is not rendered inadmissible because it relates to events falling outside the time frame alleged in the indictment."); *United States v. Crocker*, 788 F.2d 802, 806 (1st Cir. 1986)("Evidence of acts prior to a conspiracy's alleged onset have been admitted as relevant to show the conspiracy's existence, its purpose and the significance of later behavior . . . to prove motive or intent . . . or to show a conspiracy's nature and objective.").

Evidence of industry practices during the recession is similarly admissible to show intent. While this Court has not squarely addressed the admissibility of such evidence in a bank fraud prosecution, in *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005), it was held that "evidence that a physician consistently failed to follow generally recognized procedures tends to show that in prescribing drugs he

was not acting as a healer but as a seller of wares," and was admissible in a 21 U.S.C. § 841 prosecution. *See also United States v. Riddle*, 103 F.3d 423, 430 (10th Cir. 1995)(finding error for the district court to exclude testimony about what other banks would have done, because such testimony "would have supported [the defendant's] contention that any failure to disclose his interest was not deceitful or even intentional.")

As discussed, the excluded evidence was relevant to: (1) provide context for the jury to understand the defendant's actions during the time period of the alleged conspiracy; (2) show that the alleged "unsafe and unsound" banking practices as well as the subsequent collapse of the Bank resulted from mismanagement, not fraud; (3) show that the practices were open and that no attempt was made to conceal them; (4) show what the board of directors already knew about the troubled borrowers prior the start of the conspiracy; (5) show that the practices were part of a normal, good faith response to the recession, and (6) show that Mr. Fields behaved inconsistently with someone who had fraudulent intent. The district court made no attempt to analyze the relevance of the evidence that was offered under the proper standard, relying instead on an arbitrary date that the indictment alleged the conspiracy began., and sometimes relying on no reason at all. This is an abuse of discretion that warrants reversal.

**D.    The district court arbitrarily and erroneously limited Mr. Fields's direct testimony to seven and a half hours.**

**1)   Summary of the proceedings and excluded testimony as they relate to the direct examination of Mr. Fields.**

At the conclusion of the Government's case in chief, which consumed six weeks and lasted far longer than the Government's original estimate,[11] the district court asked defense counsel how long they expected their cases to be. At the time, the district court specifically stated that it would not hold defense counsel to their estimates.  (Tr. 4/22/2013 at 5785). Under that assurance, Mr. Fields's counsel gave an estimate of two to three days. (*Id.*).

When Mr. Fields took the stand on the afternoon of May 7, 2013, he was on the second full day of his defense case. He was also the last witness to testify in his defense. His direct testimony followed a logical pattern, beginning with general matters such as his background and relationship with major borrowers, and then moving into specific transactions that were alleged to be fraudulent. Mr. Fields would generally set forth his version of the events and explain his reasons for the transactions. None of his testimony was cumulative or repetitive. At the end of Mr. Fields's first day of testimony, the trial judge suggested that Mr. Fields's testimony

---

[11]    The trial was originally expected to last from four to six weeks.  (Tr. 3/19/2013 at 16).  The Government's case-in-chief ultimately took more than six weeks.

might be completed the next morning. Mr. Fields's counsel promptly corrected that misunderstanding, and the district court gave no further indication that it would impose a time limit. Tr. 5/7/2013 at 8535.

Mr. Fields resumed his testimony the next day. After lunch break, at around 2:00 pm, the district court first announced that Mr. Fields must complete his direct testimony by the end of the day. Tr. 5/8/2013 at 8689-90. Counsel for Mr. Fields immediately objected. *Id*.  The district court responded that "that's another issue you can add to the list [for appeal]."  (Tr. 5/8/2013 at 8689). Shortly thereafter, the district court clarified that Mr. Fields would have only until 6:30 pm to complete his testimony. (Tr. 5/8/2013 at 8770-71).  Before Mr. Fields could respond, the district court stated: "I really don't need to hear a response. That's the court's view. I understand you object to it." (*Id.*).

When Mr. Fields again attempted to address the time limit and move for a mistrial, the district court threatened to jail his counsel for contempt. (Tr. 5/8/2013 at 8772-73).  After the jury was dismissed for the day, Mr. Fields's trial counsel attempted to proffer the additional testimony Mr. Fields would have furnished, and the district court refused to hear the proffer. (Tr. 5/8/2013 at 8872-73). As a result, Mr. Fields's counsel was forced to file a written brief that night, explaining that "Mr. Fields has not concluded relaying his version of events[,]…was unable to address sixteen criminal transactions out of the thirty criminal transactions

specifically alleged against him in the Superseding Indictment…[and] still has to rebut the Government's claims…by offering, through him, *inter alia*, evidence from minutes of meetings of the Audit Committee and Board of Directors." (Dkt. 396 at 2-3).

Several days later, the district court entered an order addressing the limitation of Mr. Fields's direct testimony. (Dkt 414, entered 5/17/13). In that order, the district court wrote: "[a]t the outset, counsel for Defendant Fields requested two to three days to present his evidence." (*Id.* at 2). This is a misstatement, because Mr. Fields only ever gave an estimate based on the district court's assurance that it would not hold defense counsel to their original estimates. (Tr. 4/22/2013 at 5785). The district court ultimately overruled Mr. Fields's objection and his motion for a mistrial. (Dkt. 414).

**2) The district court abused its discretion in cutting off Mr. Fields's direct testimony.**

It is a bedrock principle of constitutional criminal law that the defendant has a right to testify. The right of an accused "to present his own version of events in his own words" is "essential to due process of law in a fair adversary process" and "more fundamental to a personal defense than the right of self-representation." *Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987).

Under Federal Rule of Evidence 611(a), district courts may impose durational limits on a defendant's own testimony to avoid waste of time. *See United States v. Midgett*, 488 F.3d. 288, 300 (4th Cir. 2007). However, such limits must be imposed with an eye towards "the importance of allowing a criminal defendant to testify fully on his own behalf," and the district court must ensure that the defendant is given a "full and fair opportunity to reach all material points." *See United States v Midgett*, 488 F.3d 288, 299 (4th Cir. 2007)(time restrictions imposed only when testimony "drifted into areas of less obvious relevance."); *United States v. Titus*, 475 Fed. App. 826, 837 (4th Cir. 2012)(defendant "points to no piece of evidence that he was unable to put before the jury" because of time limit.); *United States v. Ereme*, 2007 U.S. App. LEXIS 8198 (4th Cir. 2007)(same). Accordingly, any "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve," *Rock*, 483 U.S. at 55-56, and a district court abuses its discretion when it ignores this principle. *United States v. Ereme*, 2007 U.S. App. LEXIS 8198 at 5-6 (4th Cir. 2007).

Mr. Fields was not able to reach anywhere near all material points of his testimony. When the district court stopped Mr. Fields, he had just finished discussing the Arney loans, and had started testifying about loans to Eric Menden and George Hranowskyj. He was unable to testify about: (1) legitimate reasons he

had to approve loan increases to Menden and Hranowskyj, which the Government treated as evidence of preferential treatment for co-conspirators; (2) his lack of control over an account from which Menden and Hranowskyj used construction funds for personal purposes, and which the Government alleged was evidence of a conspiracy; (3) loan documents relating to Menden and Hranowskyj's purchase of various bank-owned property, which showed that nothing was hidden on the credit reviews Mr. Fields prepared, and that the loans were approved in the normal course of business; (4) board of directors meeting minutes from 2008 to 2010, which showed that Tom Arney, Eric Menden, and George Hranowskyj frequently appeared on the past due list during this time, and therefore, that Mr. Fields had no motive to conceal the fact that their loans were past due; and (5) audit committee meeting minutes from 2007 to 2010, which showed that although the Bank's internal auditor knew all of the banking practices Mr. Fields used, he never described these practices as fraudulent to Mr. Fields. The district court's refusal to allow Mr. Fields to complete his direct testimony was an abuse of discretion and violated Mr. Fields's due process right under the Constitution.

The district court stated that it was empowered by this Court's precedent to limit the defendant's testimony as it did.  However, the limitation in this case was in fact contrary to what this Court requires.  (Tr/ 5/8/13 at 8770).

This Court has called the "failure or refusal . . . to exercise discretion" an abuse of discretion. *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993). In order to make a reasoned decision as to whether Mr. Fields had reached all material points in his testimony, it was necessary for the judge to consider what Mr. Fields had yet to testify to. In this case, the district court refused to allow defense counsel to make a proffer, and threatened counsel with contempt when he attempted to make a record and explain why it was crucial for Mr. Fields to complete his testimony. Instead of basing its decision on what testimony Mr. Fields still intended to provide, and weighing the probative value of that testimony against the additional time needed, the district court refused to engage in this analysis. Thus, the district court erred by reason of its failure to exercise discretion.

A district court also abuses its discretion when it does not apply its rulings in an even-handed manner. *United States v. Sellers*, 544 F.2d 884 (4th Cir. 1977). This case involved 2.1 million pages of documents and more than six weeks of testimony from prosecution witnesses. The government's case far exceeded its original time estimates. (Tr. 3/19/2013 at 16)(originally estimating that the entire trial would take four to six weeks). The district court extended this estimate time and again to accommodate the Government's need to present a case. By contrast, Mr. Fields's case-in-chief lasted just three days. His direct testimony was the most

critical part of his case, yet the district court was not willing to allow Mr. Fields to complete his direct testimony.

A district court abuses its discretion when it relies on arbitrary factors to make a decision. The district court in this case insisted that seven-and-a-half hours was enough time for Mr. Fields's direct testimony simply because the co-defendants who testified before him had a similar amount of time.[12]  (Tr. 5/8/2013 at 8873-74). As Mr. Fields's counsel explained, however, there were more transactions involving Mr. Fields than any other defendant. (*Id*). Thus, instead of asking whether Mr. Fields had been able to "reach all material points" in his testimony, as it was required to do to preserve Mr. Fields's constitutional right to testify, the district court simply imposed a one-size fits all time limit in this case, with no regard to what substantive testimony Mr. Fields had to offer still.

Moreover, Mr. Fields did not have advance knowledge of any limitations on his testimony. *Cf. Ereme*, 2007 U.S. App. LEXIS 8198 (noting that "Ereme was aware of  . . . the time allotted to each of the parties").  Just the opposite was true here. The district court specifically told the defense before their cases began that they would not be held to their time estimates, and Mr. Fields's counsel should have been able to rely on that representation. Yet the district court imposed a strict

---

[12]    In *Titus*, the very same trial court provided the defendant with "slightly more than two full days" of direct testimony, even though the government's case-in-chief took only 12 days.

deadline only after Mr. Fields began to testify. While Mr. Fields would have needed more time to testify even if he had known about the time limit in advance, the district court's actions in this regard caught Mr. Fields completely by surprise, and he did not even have an opportunity to confer with his attorney on which parts of his planned testimony should be left out.

For all of these reasons, this case stands in stark contrast to instances where this Court has upheld time limits imposed on direct examination. *See Midgett*, 488 F.3d. at 300 (limit imposed when "defense counsel had advised the court that his questioning was nearly finished."); *United States v. Ereme*, 2007 U.S. App. LEXIS 8198 at 6 (4th Cir. 2007) (defendant had seven days for defense case, "was aware of…the time allotted to each of the parties," and had an opportunity to "effectively answer[] the charges against him and contest[] each of the elements of those charges."); *Titus*, 475 Fed. Appx. at 837 (defendant testified for two days in a trial lasting only 12 days, and could not identify any "evidence that he was unable to put before the jury.") Unlike the foregoing cases, Mr. Fields was unable to discuss numerous substantive issues, lacked advance notice of the time limit, and was given an unreasonably short amount of time in view of the complexity and number of charges he had to answer. Accordingly, the district court's time limit violated Mr. Fields's constitutional right to testify**.**

## II.   THE DISTRICT COURT ERRED IN ADMITTING UNDISCLOSED EXPERT TESTIMONY IN THE GUISE OF LAY "SUMMARY" TESTIMONY.

### A. Background of the undisclosed expert's testimony.

At trial, the Government called Lori Williams, an auditor who worked for the FBI, to testify about her analysis of financial transactions in the case, on which she prepared summary charts.  Tr. at 3566. The Government did not disclose Ms. Williams as an expert, and provided no Rule 16(a)(1)(G) disclosures in connection with her testimony.

Through Ms. Williams, the Government introduced numerous charts into evidence, purportedly as Rule 1006 summaries. The purpose of many of these documents was to show that the proceeds of BOC loans to certain "troubled" borrowers were used for purposes other than those for which the loan was given, raising the inference that Mr. Fields should have known that loan funds were being misused.  The Government also used Lori Williams's testimony and summary charts to insinuate that Mr. Fields lowered interest rates on loans whenever he was asked to do so by the borrowers. (Tr. 4/10/2013 at 3635; Gov't Ex. 1E-91).

On cross-examination, Ms. Williams admitted that she used her specialized knowledge and training to prepare the charts (Tr. 4/10/2013 at 36:8-19), and used specialized software, based on her training, to reconcile the transactions. (Tr. 4/10/2013 at 3641-42).

After showing that Ms. Williams applied her specialized knowledge, training, and professional judgment to prepare the exhibits, counsel for Mr. Fields moved to strike the exhibits as well as the testimony relating to those exhibits on the ground that they constituted undisclosed expert testimony by a lay witness. 3644, 3646; 3679. The government argued that the witness was merely doing calculations and did not need to be disclosed as an expert. 3644. The district court accepted this position, holding that the testimony did not constitute expert testimony. 3544-3645, 3646, 3657.

On this basis of its finding that Ms. Williams was a lay witness, the district court also insulated her from defense cross-examination as to her methodology and the resulting conclusions presented in charts, even though Ms. Williams had admitted that different methodologies would lead to different results. (Tr. 4/10/2013 at 3650).

### B. The district court erroneously admitted undisclosed expert testimony and then compounded the error by precluding proper cross-examination.

Recognizing both the "powerful" and "potentially misleading" nature of expert testimony, *United States v. Dorsey*, 45 F.3d 809, 815-816 (4th Cir. 1995), the drafters of Rules 701 and 702 (as amended in 2000) emphasized that those rules exist to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay

witness clothing." *Advisory Comm. Notes to 2000 Amendments*; *see also United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006) (Rule 701 forbids the "admission of expert testimony dressed in lay witness clothing.").

Ms. Williams was never noticed as an expert under Rule 16. Yet, she unequivocally admitted that she applied her training and experience to choose a methodology to prepare her testimony, and that the choice of methodology can affect the outcome of her analysis. Her testimony thus fell squarely within the definition of Rule 702, and should have been excluded due to lack of notice. *United States v. Harris*, 995 F.2d 532, 536 (4th Cir. 1993)(excluding testimony where notice was not provided until the first day of trial)(citing *United States v. Curry*, 977 F.2d 1042, 1052 (7th Cir. 1992)(notice of the proposed proffer of expert testimony given four days before trial was prejudicial to the Government and would have justified its exclusion)); *United States v. Dowling*, 855 F.2d 114, 118 (3d Cir. 1988)(notice of the proposed proffer of expert testimony given five days before trial was considered prejudicial to the government); *see also Wilkins v. Montgomery*, 751 F.3d 214, 220-223 (4th Cir. 2014)(upholding exclusion of expert testimony in a civil case where disclosure was made after the deadline set and after discovery closed). In this case, there was *no* notice, let alone timely notice.

The district court compounded this error by repeatedly sustaining objections to cross-examination questions that would have challenged the reliability of Ms.

Williams's analysis, on the grounds that these questions called for speculation. (Tr. 4/10/2013 at 3648-49)(sustaining objection to whether choice of methodology can affect outcome); (Tr. 4/10/2013 at 3660)(sustaining objection to whether it was possible to test her methodology); (Tr. 4/10/2013 at 3666)(sustaining objection to whether the charts accounted for certain bookkeeping methods); (Tr. 4/10/2013 at 3675)(sustaining objection to whether the charts reflect interest rates being tied to prime). Yet, it is well established that experts can be questioned in the manner that Mr. Fields's counsel attempted to cross-examine Ms. Williams. *Certain Underwriters at Lloyd's v. Sinkovich*, 232 F.3d 200 (4th Cir. 2000)(explaining that unlike lay witnesses, it is appropriate to question experts with hypotheticals).

The erroneously admitted testimony was prejudicial to Mr. Fields because it suggested to the jury that an experienced forensic accountant, applying her expertise, training and knowledge, found that the proceeds of the loans that Mr. Fields funded were being used for illegitimate purposes. The district court violated clear rules of evidence and criminal procedure by admitting this testimony and then precluding meaningful cross-examination, and its abuse of discretion constitutes reversible error.

### III. THE DISTRICT COURT'S MULTIPLE ERRONEOUS RULINGS WERE HARMFUL AND DEPRIVED MR. FIELDS OF A FAIR TRIAL.

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *United States v. Lighty*, 616 F.3d 321, 358 (4th Cir. 2010) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) and *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). In this case, the district court's multiple erroneous rulings not only violated the rules of evidence, but also deprived Mr. Fields of his constitutional rights, including the rights: to testify in his own defense, to confront the witnesses against him, and to present a complete defense.

Evidentiary rulings and (nonstructural) constitutional errors are subject to harmless error review. *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997). The Government bears the burden to show that the error was harmless. *United States v. Olano,* 507 U.S. 725, 734 (1993). For non-constitutional errors, the reviewing court should affirm only if "the conviction is sure that the error did not influence the jury, or had but very slight effect." *See Kotteakos v. United States*, 328 U.S. 750, 765 (1943). For constitutional errors, the reviewing court should affirm only if it is convinced that the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967).

While any of the foregoing errors is sufficient to individually warrant reversal under either the *Kotteakos* or *Chapman* standards, "pursuant to the cumulative error doctrine, 'the cumulative effect of two or more individually

harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'" *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009)(quoting *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). When the question concerns cumulative error, a reviewing Court "aggregates all the errors. . . . and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Rivera*, 900 F.2d at 1470.

All of the district court's errors save one involved the exclusion of relevant defense evidence. Moreover, all of the excluded evidence was relevant to the main point of defense—which is Mr. Fields's *mens rea*. As explained, these errors prevented the jury from hearing crucial exculpatory evidence that would have allowed them to acquit Mr. Fields.

The district court's extensive hearsay errors prevented the jury from hearing evidence of, *inter alia*, contemporaneous statements made by the borrowers to Mr. Fields, in order explain why Mr. Fields made loans to them and what was in his mind at the time. *See Leake*, 642 F.2d 715 (4th Cir. 1981)(finding prejudicial error where district court erroneously excluded a conversation offered "to show that Leake believed that the funds were being used in a legitimate fashion").

Its erroneous application of Rule 608(b) prevented Mr. Fields from properly discrediting two key witnesses who alleged that Mr. Fields received a gratuity. *See*

*id.* (finding prejudicial error where district court erroneously prevented cross-examination of a key witness's involvement with other fraudulent financial schemes.)

The court's erroneous understanding of relevance led it to exclude numerous pieces of evidence that would have supported Mr. Fields's defense that the challenged practices were of longstanding nature and not indicative of fraud.

The court's arbitrary, surprise decision to cut off Mr. Fields's direct testimony caused Mr. Fields to be unable to explain more than half of the transactions that the Government alleged were fraudulent, and to introduce evidence from the audit and board of directors meeting minutes that would have supported his defense.

Finally, the Court's erroneous admission of evidence in the Government's favor permitted the Government to introduce expert opinion under the guise of lay testimony, and Mr. Fields was not even given a full and fair opportunity to contest this expert opinion.

Given the nature and the magnitude of the foregoing errors, the Government simply cannot show that the errors in this case could be found harmless.

## CONCLUSION

The district court committed multiple errors in this case that prevented Mr. Fields from putting on important evidence to support his defense. In addition, the

district court permitted a lay witness to express expert opinions that are highly prejudicial to Mr. Fields. These errors were harmful, and prevented Mr. Fields from having a fair trial.  This Court should reverse the convictions and remand for a new trial.

## ARGUMENT BY EDWARD WOODARD

### I.    THE DISTRICT COURT ERRED IN DETERMINING THAT THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE JUDGMENTS OF CONVICTION AGAINST EDWARD WOODARD.

Appellant Ed Woodard respectfully submits that there is important, undisputed Background information against which this argument should be considered.

### The Loan Approval Process

Ed Woodard, as a Director of the Bank, is charged, in a number of instances, with having "caused" certain loans to have been made that are the subject of this prosecution. Every loan that is subject to this prosecution was approved by some, or all of the members of the Board of Directors of the Bank of the Commonwealth, as either members' of the Executive Loan Committee or the full Board of Directors.

### The Board of Directors

Loans commenced with loan officers, who were responsible for "working up" each loan to the Executive Loan Committee, where three Directors were members. The meetings were also attended by the Chief Lending Officer, other loan officers, and any loan officer that had a loan to be presented to the Committee for approval.

Directors were fully engaged in the loan approval process, were familiar with each borrower (including those having difficulties with their payments) and, at all times, were kept fully informed of those borrowers that represented a loss to the Bank.

No Director ever even suggested any criminal activity on the part of Ed Woodard over his tenure of 38 years.

## Internal and Independent Auditors

There was (1) a full time employee of the Bank; an (2) "outside" and "independent" Richmond accounting firm, for over 20 years with the Bank; and (3) an internal bank Auditing committee. None of these parties ever suggested that Mr. Woodard engaged in fraud.

## Examinations by Regulators

The Bank was regularly examined by State and Federal regulators on alternate years. since Ed Woodard became affiliated with the Bank in 1972

(4/26/13 tr 6789). No examination ever suggested criminal activity by Ed Woodard.

The 12 Counts against Ed Woodard all require a criminal intent to either "knowingly and intentionally" commit Bank fraud; "to injure and defraud the Bank"; or to knowingly making false statements; and/or "willfully" misapply. Even when viewed in the light most favorable to the government, the defendant respectfully submits that the evidence was insufficient to support guilty verdicts.

### The National Financial Crisis

The indictment alleges Conspiracy to Commit Bank Fraud for the period from January 2008 through September 23, 2011. The alleged conspiratorial period coincides almost precisely with the period and duration of that National Financial Crisis, or recession, of the years 2008 to 2012, the Nation's worst financial crisis since the Great Depression (5/2/13 tr 7963). See (4/25/13 tr. 6729)(Government witness acknowledging existence of national financial crisis); (4/17/13 tr. 5041)(Government witness calling the crisis a "recession" and acknowledging the existence of the TARP program).

During this same time period, the Bank was pursuing an aggressive growth plan that focused on commercial real estate and commercial development lending. In its 2007 "strategic plan" the Bank exceeded its efforts to increase its assets to $1 billion by 2009, actually increasing assets to $1.3 billion (see refused exhibit,

Material Loss Review (DTX 2126)). Examinations before the financial crisis were "satisfactory"; the 2009 examination indicated that the Bank was in trouble (4/25/13 tr 6730, 6731).

Federal District Court Judge Terrance Boyle, in the United States District Court for the Eastern District of North Carolina, Southern Division, referring to the crisis as an "economic collapse" and "an unpredictable economic catastrophe," dismissed a suit filed by the FDIC against officers and directors of a failed community bank that, strikingly similarly, had also undertaken a comparable growth strategy plan, in effect, during the financial crisis.

The Government has never challenged the existence of a financial crisis, its severity, or its temporal concurrence with the alleged "conspiracy". The difference between the perception of the prosecution and the defense lies in the "effect" of that crisis, on the Bank. Ed Woodard's position was that the collapse of the Bank of the Commonwealth was due to the Financial Crisis coming at the same time as the Bank's Aggressive Growth Strategic Plan.

### The Office of Inspector General's Material Loss Review of the Bank of the Commonwealth

Under federal banking laws, the Office of Inspector General of the Federal Reserve Bank ("OIG") is required to investigate the failure of any federal reserve bank. *12 U.S.C.§ 1831*o(k); and if there is a "material" loss then the OIG is

required to produce a public report that includes, "why" the bank failed. On April 12, 2012, the OIG filed a Material Loss Review for the Bank of the Commonwealth.

The Material Loss Review was not admitted into evidence (DTX 2126 Refused). The report nowhere suggested any criminal activity on the part of Defendant Woodard; but clearly recognized both the National Financial Crisis and the Bank's "aggressive growth plan" as "causes of Commonwealth's failure". The report also referred to "a severe real estate market decline" as a result of the financial crisis (DTX 2126 refused, pgs 12, 201).

In discussing the "causes of the Bank's failure", the Report does not include any suggestion of criminal conduct.

### Count 1: Conspiracy to Commit Bank Fraud

In this case, the elements charged in Count One are:

- "Knowingly execute a scheme an artifice to defraud"
- "To fraudulently conceal the banks true financial condition"
- "To provide preferential treatment to certain troubled borrowers"
- "To perform favors for bank insiders"

The Government was required to prove the following elements: (1) an agreement among the defendants to commit an illegal act; (2) knowing and willing participation by the defendants in the agreement; and (3) (An overt act by at least one of the defendants in furtherance of the purpose of the agreement. *United States*

*v. Hedgepath, 418 F.3d 411, 420 (4th Cir. 2005)*; *United States v. Rankin, 870 F.3d 109, 113 (4th Cir. 1989).*

One of the Government's principal witnesses, Eric Menden, a real estate developer and long time borrower, was used by the FBI, in their investigation of the Bank. Menden was "wired" on more than 20 occasions to secretly record conversations with all of the alleged co-conspirators. At least four or five of those wire taped meetings were with the Defendant Woodard (4/2/13 tr 2068).

In spite of those extensive efforts, not a single recorded interview of Defendant Woodard was used in any way in the trial. The only conclusion to be drawn is that Defendant Woodard never uttered a single word that even tended to incriminate him.

With almost four years of an alleged "conspiracy;" with 2.2 million documents produced by the Government there is no evidence in the record of:

- Any statements/admissions of any alleged defendant co-conspirators (45 hours)
- Not a single page of any document (2.1 million pages) indicating any "conspiracy"
- Denials of any conspiracy by all alleged co-conspirators (including Simon Hounslow, who was acquitted of all Counts)
- No evidence of any "agreement" (express or tacit)
- "Unsafe and unsound" banking practices, relied upon by the Government, were not criminal acts

Co-defendant, Simon Hounslow, who was acquitted by the jury of all charges, testified that he had "had a lot of disagreements…about a lot of loans"

with Defendant, Woodard, (5/2/13 tr 7857); and that those "disagreements" were not about "whether the loans were legal or illegal" (5/2/13 tr 7859) but "about whether they were good credit risks" (5/2/13 tr 7859).

The trial record is simply devoid of any evidence of "any agreement", direct or circumstantial. The direct evidence is that there was "disagreement". It is respectfully submitted that the evidence is insufficient to support a conviction of Defendant Woodard of "conspiracy" under Count 1.

### *Count 8 : False Entry in Bank Record*

Count Eight, False Entry in a Bank Record alleges that Ed Woodard falsely indicated in a bank record that the Board of Directors had approved three loans totaling $11 million dollars to Charlie Falk and his son "at an April 15, 2008 meeting. In order to be found guilty of making *a false entry in a bank record* under *18 U.S.C. § 1005*, it must be proven beyond a reasonable doubt that one acted knowingly and with intent to injure or defraud. *See, 18, U.S.C. § 1005*. ("…makes any false entry in any book, report, or statement of such bank *with intent to injure or defraud such bank*…" (Emphasis added)). In addition, any alleged "false entry" must be "material." To be "material", the false entry must have "a natural tendency to influence" or to be "capable of influencing a decision or action of another".

The evidence was undisputed that the Board <u>did</u> approve the loan, but not at the April 15, 2008 meeting; the date of the meeting that Defendant, Woodard entered into the Bank records.

Simon Hounslow, Chief Lending Officer testified, that he (and not Woodard), made the mistake (5/1/13 tr 7528-7530); Hounslow also denied he did it fraudulently (5/1/13 tr 7549), and the jury accepted his testimony as true by acquitting him of all charges.

The trial record demonstrates that Woodard, in recording that date, relied on the date of the previous Executive Committee Minutes, which Hounslow has testified was his mistake. Woodard knew that the loans had, indeed, been approved by the Board (as set out in detail hereafter) and simply followed Hounslow's mistaken April 15, 2008 meeting date, when, he,  Woodard, recorded that date, in the subject Bank record, at a later time.

The Falk loans were actually approved by a "telephone poll" meeting for a vote by a Quorum of Board members; and no Board member has ever denied that "telephone poll" (4/26/13 tr 6913-6915). Later, in a customary "ratification" meeting, of the Executive Committee, (at which two Board Directors were present and voting) (5/1/13 tr 7526, 7527) the Falk loans were "ratified", without objection (4/8/13 tr 3322, 3325 – 3326).

This $11million dollar loan was not insubstantial and there was not an iota

of evidence that any Board Member ever raised any question of their approval of that size loan. In addition, the law firm of the Chairman of the Bank's Board of Directors (who was the senior partner) represented the Bank in the several months of processing and finalizing of those very Falk loans; nor was there any "issue" ever raised by this Chairman that the loans had not been Board approved.

Towne Bank, the largest local community Bank, had similarly loaned large amounts to Falk; and worked jointly with the Bank of the Commonwealth to restructure both Banks' Falk loans. The President, Robert Aston, a defense witness, testified that his Bank worked in close cooperation with Defendant Woodard for the Bank of the Commonwealth; and that Towne Bank paid $7.5 million dollars (4/25/13 tr 6635) to Bank of the Commonwealth as part of that joint workout. (4/25/13 tr 6627-6629). The entire process was in the open and continued over a period of several months.

No rational juror could find from this evidence that the Board of Directors did not know of these continuing transactions; did not know of the $11 million dollars in loans; and did not approve the loans. At trial, the Government suggested that the alleged "falsity" under Count 8 is a "temporal" one, to-wit, that the loans were not approved "at an April 15, 2008 meeting." However, there is no evidence that the date of the approval was a material fact under which a conviction can be sustained.

Accordingly, it is respectively submitted that the evidence is insufficient to support a conviction; the conviction should be overturned and the charge dismissed.

### Counts 12, 16, 17 and 18 : Unlawful Participation in a Loan

Count Twelve and Counts 16 through Count 18 all allege that Ed Woodard unlawfully participated in loans by "causing" the Bank of the Commonwealth to fund loans to Bank customers, Thomas Arney, George Hranowsky and Eric Menden. A conviction under *18 U.S.C. § 1005* must be supported by proof beyond a reasonable doubt that Defendant Woodard "participated" with intent to defraud the bank, which is simply absent in this case. *See, 18, U.S.C. § 1005*. Woodard's relationship, if any, with those loans, was not "participation", nor was any relationship with any intent to defraud.

### Count 12

Count 12 charges that Woodard "caused the Bank to fund a $433,000 dollar loan to one Thomas E. Arney for the purchase of a condominium owned by Edward J. Woodard, located at 388 Boush Street in Norfolk, Va". The loan was made to Woodard's wife, Sharon Woodard, and was originally approved by lending officers, Don Price, Bob White, Stephen Fields and Simon Hounslow (5/1/13 tr 7492); from there it went to the Executive Committee, comprised of 3

Board Members. Defendant Woodard abstained from voting. There were no concerns expressed by the Board members (5/1/13 tr 7495, 7496); or at the subsequent Board of Directors meeting of September 19, 2006 when this loan to Sharon Woodard was approved. Hounslow, Chief Lending Officer, who handled this loan, testified unequivocally that "Mr. Woodard (the defendant) was not a borrower"; that he, Hounslow, had approved loans to other Directors' spouses and followed the same practice in those other spouses' transactions as in the approval of the Sharon Woodard loan. Defense witness, James Poti, a Certified Public Accountant for 40 years (5/6/13 tr 7989), an "outside" or independent auditor for the Bank, (5/6/13 tr 8179), of a Richmond Certified Public Accounting Firm, Witt Mayers, testified that there was nothing wrong with Woodard selling his own condominium; that there was nothing improper with selling to a Bank customer; and there was nothing wrong about a loan to Arney to purchase the condominium when Woodard did not participate in the loan process and abstained (5/6/13 tr 8178).Woodard's relationship to this transaction was solely as a _seller_ of a condominium, in a *bona fide* transaction for value. Woodard in no way "caused" the Bank to fund this loan.

The undisputed evidence is contrary to the allegation of Unlawful Participation. Accordingly, the conviction of a violation of Count 12 of the indictment should be reversed and the charges dismissed.

### Counts 16-18

Counts Sixteen through Eighteen similarly allege that Defendant Woodard unlawfully participated in three loans by "causing" the bank to fund loans to two long-time customers, real estate developers, George Hranowsky and Eric Menden.

These customers had had many prior substantial and successful loans with the Bank. Their relationship with the Bank had been a valuable and profitable one for the Bank, until the National Financial Crisis of 2008 to 2012, when real estate values fell and these borrowers and many such developers had trouble paying their loans (4/2/13 tr 2023-2047). During the years 2008, 2009, 2010 many developers, "were struggling to stay alive and maintain their existence" (4/29/13 tr 6808).

The loans were for the customers to purchase three different properties from the owner of the properties, Troy Brandon Woodard (Defendant Woodard's son) and each loan is the subject of Counts 16, 17 and 18 of the Indictment. There is no allegation that Ed Woodard "received" any money or "benefit"; and the evidence is clear that he never did.

Woodard did not illegally "participate", and consequently had no intention to defraud. In fact, the only "relationship" that Defendant Woodard had with any of the three loans, (at the request of his son Brandon, the owner of each of those properties) was simply to inquire of the borrowers, Hranowsky and Menden, "whether they were interested in purchasing any of those properties"; that is what

Woodard did: ask if they had any interest in those properties; and that is the sum total of what he had to do with those three loans.

Again, the evidence does not demonstrate that Woodard participated in these loans. He abstained from voting on these loans; and the record is certainly devoid of any intent to defraud. Woodard's involvement in these transactions was limited to simply approaching Menden and Hranowsky (4/29/13 tr 7000, 7003, 7005).

Accordingly, for the foregoing reasons Defendant Woodard respectfully submits that the evidence is insufficient for a conviction on Counts Sixteen through Eighteen of the Superseding Indictment.

### *Count 13and Count 15: False Statement to a Financial Institution*

For conviction under *18 U.S.C. § 1014,* the Government was required to prove, beyond a reasonable doubt, that Defendant Woodard made a "false statement of a report" and did it "knowingly".

## Count 13

Count Thirteen alleges that Ed Woodard knowingly made a false statement to the Bank of the Commonwealth and caused the bank to "approve a $150,000 loan to 'nominee borrowers' when in fact Defendant, Edward Woodard, knew the actual guarantor of the loan was Thomas Arney". *18 U.S.C. §§ 1014 & 2*.

There was no evidence at trial that the borrowers were 'nominees' or that Defendant, Edward Woodard "knowingly" madee any false representation.

"Nominee" borrowers as defined in *United States v. Blackwood*, 735 F.2d 142 (4th Cir. 1984), citing *United States v. Gens*, 493 F.2d 216 (1st Cir. 1974), are "those in which bank officials assured the named debtor that they would look only to the third party who actually received the loan proceeds for re-payment." There was no such evidence at trial.  In fact, *Blackwood* further states that:

> "On the other hand, where the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him, cannot – *absent other circumstances* – properly be characterized as sham or dummy even if bank officials know he will turn over the proceeds to a third party. Instead, what we really have in such a situation are 2 loans: One from the bank to the named debtor, the other from the named debtor to the third party….In this situation, the Bank official has simply granted a loan to a financially capable party, which is precisely what a Bank official should do. There is no natural tendency to injure or defraud the bank and the official cannot be said to have willfully misapplied funds…." *Id*. at 145. (Emphasis added).

In this loan, Ryan and Ashlee Arney, son and daughter of Tommy Arney, were "qualified" borrowers; and it is undisputed that they went through the normal entire loan approval process.  They even had other loans with the Bank, and those loans were "performing" (4/29/13 tr 6993).

Moreover, the Bank had the usual applications and financial statements from both of these borrowers (4/26/13 tr 6843) and the paperwork submitted by them "supported their credit worthiness (4/26/13 tr 6843).

This was a loan to creditworthy borrowers, "financially capable" parties (as described in *Blackwood*, above.) As late as December 2010, this loan was "performing" and payments were being made and had been for about one full year.

For the foregoing reasons, Defendant Woodard respectfully submits that the evidence is insufficient to support a conviction under Count 13 of the Indictment.

## Count 15

Count 15 similarly alleges false statements relating to a $325,000 dollar loan to "nominee" borrowers, Ryan Arney and Ashlee Arney.  A third person, Brett Thompson, an attorney, was associated in this loan with Ryan and Ashlee (4/29/13 tr 6993), in that he was an "investor" in an restaurant business, which was the reason for the loan. He was the "primary strength" of this loan.

 Thompson had an office in the same building as the Bank headquarters and had "several loans to him and was considered to be one of the Bank's better borrowers and certainly one of the more responsible borrowers". (4/29/13 tr 6994). While he was not a guarantor on the loan, he had invested $100,000 dollars in the restaurant. The loan was also secured by UCC assets, furniture, fixtures and equipment in the restaurant. (4/26/13 tr 6842, 6843)

This loan went through the normal loan process; Executive Committee approved; and ultimately Board of Directors approved. It is submitted that none of

the borrowers on this loan were "nominees," and Count 15 is not supported by the evidence.

### *Count 14 and Count 25: Misapplication of Bank Funds*

These two Counts allege violations of 18 U.S.C. §656, "willful misapplication of moneys, funds or credits" of a Bank; and both Counts, we respectfully submit, are unsupported by the evidence, and for the same reasons.

In *Blackwood,* above, this Court set out the meaning of "willful misapplication" as follows:

> …An act or omission is "willfully" done, if done voluntarily and intentionally and with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law.

> To act with *intent to injure or defraud means to act with intent to deceive or cheat, ordinarily for the purpose of causing a financial loss to someone else*, although it is not necessary that the bank has suffered an actual loss, or to bring financial gain or benefit to one's self, the tendency of which may have been to harm the bank. (emphasis added)

### Count 14

Count 14 alleges that Woodard and another loan officer "willfully caused the Bank to fund a $100,000 line of credit, with intent to injure and defraud the Bank", knowing that guarantors were "nominee" for Tommy Arney. The guarantors were

Arney's adult children, Ryan and Ashlee Arney, with a third-party investor, Brett Thompson, attorney, (4/29/13 tr 6989) and all of whom were creditworthy, as set out in detail in the previous argument under Counts 13 and 15 above, (alleging False Statements).

Woodard is the longtime CEO and President of the bank, who voluntarily surrendered almost $2 million dollars in accrued and payable benefits. That, on its face, is so inconsistent with the "specific intent to cheat and cause loss to the Bank", that no rational juror could properly find that Woodard had such intent.

In addition, there is noof credible evidence that the borrowers were nominees (or that Defendant Woodard had any knowledge that they were in fact nominees), or that Ed Woodard knew how the Borrowers would use the line of credit; or that he had any duty or obligation to know.

Furthermore, it was undisputed the Defendant Woodard, after his attendance at the Executive Committee vote, had "no further role" in that loan.

Martha Root, a Government witness, a loan assistant/processor for the Chief Lending Officer (4/5/13 tr 2883), explained that after a loan closing, the transaction would go to the "loan processing department"; and that Defendant

Woodard had nothing directly to do with that department; that the day-to-day operations were managed by someone else (4/5/13 tr 2962).

Michele Barham, a Government witness, was "the loan operations manager (4/4/13 tr 2701), who had worked at the Bank for 14 years. She testified that when she verified that the funds, of a loan, "went to the borrower as approved", she had no further duties or responsibilities to follow up to see what the borrower did with the funds; and neither did Defendant Woodard (4/4/13 tr 2802).

Accordingly, there is insufficient evidence of an intent to injure and defraud the bank to support a conviction under *18 U.S.C. §§ 656 & 2, 18 U.S.C. § 656.*

## Count 25

Defendant Woodard was convicted of Count 25, which alleged that he misapplied bank funds, "with intent to injure and defraud the bank", by "causing" the bank to fund $250,000 dollars to Co-Defendant Dwight A. Etheridge's company with knowledge that the loan was "essentially" unsecured by collateral and "that loan proceeds would be used to make interest payments on other loans at the Bank", *18 U.S.C. §§ 656 & 2.*

Co-defendant Etheridge, a Bank borrower, owned and operated a residential commercial development company, as well as an employment staffing company.

In the Argument, above, for Count 14, Defendant Woodard's position as to what *18 U.S.C. § 656* required the Government to prove, to-wit: "...*with intent to*

*deceive or cheat*, ordinarily for the purpose of causing a financial loss to someone else."

There is no evidence that Defendant Woodard, who gave up almost two million dollars in Benefits, (earned over a period of many years of faithful work for the Bank), which were due and payable to him, had the "specific" intent to "deceive or cheat for the purpose of causing a financial loss to the Bank". "Helping" the Bank, as Woodard did, raises a reasonable doubt that he intended to "deceive or cheat" to "cause a financial loss of the bank".

This, to, was a typical bank loan after a "good faith" assessment by Woodard. Etheridge had impressed the Bank with his community and his company's work, as well as his relationship that he had with the Bank (4/29/13 tr 7014).

Defendant Woodard, in connection with this loan application, as President and CEO "did his due diligence" and together with two Bank loan officers, Don Price and Jeremy Churchill, visited the site of Etheridge's company, Genesis Staffing (4/29/13 tr 7014).

After that visit, and knowing that the company had been in business for some time with financial statements reflecting "profitable operations", (4/29/13/ tr 7015), Woodard, as a member of the Executive Committee (not "individually")

approved the Etheridge loan with other Committee members including other Directors (4/29/13 tr 7016).

Once Woodard had attended and voting in an Executive Committee, he had no further duties or obligations to see how the loan proceeds were used by the borrower, and had no further "role" regarding that loan (4/29/13 tr 2016). There is no evidence that Woodard had "knowledge that the loan would be used to make interest payments on other loans at the Bank".

Accordingly, the government has failed to carry its burden of proof.

Nor would the evidence at trial allow a rational juror to believe that the loan was "essentially unsecured by collateral" (whatever "essentially" unsecured means in a criminal prosecution). The trial evidence was directly to the contrary: express and undisputed evidence of the loan being secured by UCC property, furniture, fixtures, equipment, leasehold improvements and accounts receivables (4/29/13 tr 7016, 7017).

The loan also had Genesis Staffing's track record and Dwight Etheridge's guarantee.

Eric Coker, a government witness, was Chief Financial Officer of Tivest, one of Etheridge's corporations. Etheridge owned the company (4/11/13 tr 4025). Coker testified that Woodard had no knowledge of where Etheridge would direct loan funds to go (4/11/13 tr 4105).

Elemul Watts, an architect, and twenty-seven year architect planner with the Coast Guard worked on the development plans for Broad Creek Villas (4/11/13 tr 4116), a development project of Etheridge.

Mr. Watts, an architect for his employer, signed off on documents proving that the construction project had been completed to a certain point as a result of which the bank would advance more construction funds (4/11/13 tr 4117). Watts would sign an AIA, (or an American Institute of Architects) form for the Bank, which were accurate and which "the Bank had the right to rely upon…." (4/11/13 tr 4132).

This government witness was present on the construction sites that he testified about; he was in a position to know the stage of construction of those projects; he certified that information to the Bank and the Bank relied on it.

Mr. Watts was not charged with any criminal offense; and Defendant Woodard did not commit any crime when he voted for the loan.

Accordingly, Defendant Woodard submits that the evidence was insufficient for a conviction of Count 25.

### A. Count 26: Bank Fraud

Count Twenty-six alleged that Defendant Woodard, together with his son, Troy Brandon Woodard violated the provisions of *18 U.S.C. § 1344*, Bank Fraud. The first allegations are that Woodard "made false and misleading representations"

to the Bank's regulators and Board of Directors regarding insider ownership and leasing of Bank branches.

The evidence regarding any such alleged false representations is insufficient for a conviction, as set out hereafter. The prosecution contended that Defendant Woodard signed an application with the State Corporation Commission to establish a Suffolk branch bank dated July 6, 2007 (4/29/13 tr 7014); and that it set out that Glenn Development was going to lease the bank property; and that was false because the property was leased to Woodard's son, Brandon Woodard.

The problem was the "date" on the documents, which Defendant Woodard explained was a "mistake" and the prosecution urged that it was an intentional effort to mislead the State Corporation Commission.

Defendant Woodard explained that the actual lease was not dated June 30, as set out as the Application; that it was an "error" in the application but not intentional (4/29/13 tr 7109).

The principal allegation of this Count, alleging Bank Fraud, that Defendant Woodard, along with his son, Troy Brandon Woodard (who was acquitted of this Count), fraudulently instructed Kevin Glenn, a real estate developer, and contractor to wrongfully bill the bank for work that Glenn was doing at the son's personal residence. Glenn was providing, both at the same time, construction improvements for the Bank, to a new Bank branch building, in Suffolk, Virginia; and was also

making construction improvements for Troy Brandon Woodard's personal residence.

The original cost of the son's home construction contract ("agreement by handshake") was to be $150,000 up to $200,000 dollars, and in no way was to ever exceed $200,000 dollars (5/10/13 tr 9272, 9273).

However, a significant problem that arose: in spite of the $200,000 dollars maximum agreed costs, Glenn was claiming substantial additional excessive construction costs (4/22/13 tr 5907, 5908).

At a meeting of Defendant Woodard, his son and Glenn, Brandon Woodard confronted Glenn about the excessive costs and "overruns" and vigorously requesting a "stop" to any further unauthorized expenses; and threatened Glenn with stopping the job (5/10/13 tr 9275). The Bank was Glenn's "biggest source of income" that he did not want to lose both jobs (5/10/13 tr 9270).

that the Government alleges that Defendant Edward Woodard suggested Glenn to fraudulently bill the Bank for the continuing costs of Brandon's home construction, as if those costs were for Bank work. It was suggested that they "roll (wrap) costs" for the son's expenses into bills for the Bank's branch work.

Edward Woodard was convicted solely on Glenn's uncorroborated testimony. While the evidence is corroborated that no such fraudulent suggestion

or plan was ever agreed to by Woodard and his son, or ever implemented, as set out in detail below.

(Glenn had similarly made a proposal to an architect, Catherine McIntyre, to "wrap" her proposed expenses for work she would do at Brandon Woodard's home, into bills to the Bank (4/25/13 tr 6688-6690). McIntyre testified that her proposal for work at Brandon's home had been rejected by Brandon because of the costs; and that Glenn was suggesting to her that by "wrapping" her costs into the Bank's bills, she could still do the work and that they (the Woodard's) "wouldn't know that she was working on it" (4/25/13 tr 6690).

### Substantial Payments made by Brandon Woodard after the Meeting of September 13, 2008 Contrary to Glenn's Testimony that the Bank was to be billed

There are at least seventeen exhibits introduced by co-defendant, Brandon Woodard beginning September 22, 2008 through January 2009 (DTX 6592), *after* the meeting of September 13, 2008. Without dispute, these exhibits, without exception, show that Glenn continued to bill Brandon for thousands of dollars for continuing construction costs for Brandon's home, *after the meeting;* which the son continued to pay*; and, without dispute, were not billed to the bank.

Therefore, while Glenn's testimony is uncorroborated; the testimony of Defendant Woodard and his son, Brandon Woodard is completely corroborated by the seventeen exhibits.

Human experience dictates that if there had been an agreement to wrongfully "bill" the Bank for the son's personal home expenses, Glenn would not have continued to bill the son; and the son would not have continued to pay his construction expenses.

Troy Brandon Woodard, in Count 26, was charged precisely with the same allegations of Bank Fraud as Defendant Edward Woodard. Troy Brandon Woodard was acquitted of Count 26 and all of its allegations. In so finding him "not guilty" of such Bank Fraud, the jury necessarily found that the allegations against Troy Woodard were unfounded and not true.

The undisputed testimony, at trial, of both Woodards, was precisely the same: in both denying any such agreement to fraudulently bill the Bank; there was no difference in the Woodards testimony.

In accepting the testimony that found Brandon Woodard "not guilty" of Bank Fraud, the jury rejected Glenn's testimony that any such fraudulent agreement was proposed that resulted in Brandon Woodard's acquittal. Since the testimony was insufficient for Brandon to be found guilty, it is insufficient for Defendant Woodard to be found guilty.

At a minimum, the son, Brandon's acquittal, raises a "reasonable doubt" as to the guilt of Defendant, Edward Woodard. There was no evidence, upon which the jury could make a finding, beyond a reasonable doubt, that Brandon Woodard was not guilty and that Defendant, Edward J. Woodard was guilty under those precise circumstances.

Accordingly, because no rational juror could ignore the undisputed and corroborated facts (of Glenn's continuing billing to Brandon Woodard) and find Defendant Woodard guilty of Count 26 of the Indictment.

## II. THE DISTRICT COURT ERRED IN REFUSING TO TESTIMONY OF WITNESSES AND EXHIBITS RELEVANT TO THE NATIONAL FINANCIAL CRISIS OF 2008-2012 AND ITS RELATIONSHIP WITH THE BANK OF THE COMMONWEALTH.

As set out above, the occurrence and severity of a National Financial Crisis is an absolute historical fact and was a principal cause of the Bank's failure. It was strong evidence that there was no conspiracy or criminal conduct on the part of Ed Woodard..

Ed Woodard joins Stephen Fields's argument pertaining to the district court's erroneous exclusion of relevant evidence, which includes the 2012 material loss report. In addition, Ed Woodard contends that the district court erroneously

prevented him from eliciting testimony and evidence regarding the relationship between the National Financial Crisis and the Bank of Commonwealth's failure.

The court disallowed Defendant Woodard from asking a hypothetical question (5/2/13 tr 7963-7965) to the expert, William H. Purcell about the relationship because the financial crisis and the Bank's failure.

There was no objection from the Government that the hypothetical question did not include all relevant facts or that it was improper in any way. The Court sustained the objection on the ground of the "depression and recession" and its "impact" on the regulatory authorities were concerned about (5/2/13 tr 7966).

The district court also prohibited EdWoodard from cross-examining Jeffrey B. Deibel, a Federal Reserve Bank Examiner, on the findings of the OIG Material Loss Report concerning the good condition of the Bank in the year 2007 (before the financial crisis of 2008); and the causal relationship between that financial crisis, the deteriorating condition and failure of the Bank (4/25/13 tr 6754). The Material Loss Report attributed the decline and failure of the Bank to several converging factors, prominent among them being both the National Financial Crisis and the Bank aggressive growth strategy and plan.

The financial crisis, and consequently the OIG Material Loss Review Report were significant, relevant and highly important facts that would have favorably impacted Defendant Woodard's position on all Counts.   Defendant Woodard was

entitled to have that evidence before the jury the question of causal relationship between the National Financial Crisis and the Bank's failure. This is further reasons for dismissing all Counts as being insufficiently supported by the evidence.

## III. THE DISTRICT COURT ERRED IN REFUSING TO ADMIT TESTIMONY OF WITNESSES AND EXHIBITS RELEVANT TO THE $700 BILLION UNITED STATES GOVERNMENT'S TROUBLED ASSET RELIEF PROGRAM ("TARP") OF OCTOBER 3, 2008 ("THE BANK'S BAIL OUT BILL") AND ITS RELATIONSHIP TO THE BANK OF THE COMMONWEALTH.

The TARP program provided funds for banks that were struggling for existence throughout the financial crisis; and the program got its popular name "Bail Out Bill" because it saved many banks from failure (see exhibit, OIG Summary Analysis of Failed Bank Reviews, dated September 2011 (Refused) analyzing the causes of 35 small bank failures). The Bank of the Commonwealth applied for TARP funds; but at the suggestion of Federal Reserve Bank Examiner Deibel, withdrew its application.

The district court prohibited Ed Woodard from introducing evidence, through Robert Aston, Chairman and CEO of TowneBank-- the largest community bank in the Tidewater area--—that that bank applied for and received TARP funds, and as a result survived the crisis.

In light of the National Financial Crisis, (with the failure of many banks, and the rescue of many others), it was important for the jury to have a full explanation

of the TARP program and the Bank of the Commonwealth's lost opportunity for possible survival, in the jury's finding of the cause of the Bank's failure.

The district court's exclusion of this evidence prejudiced Ed Woodard's defense, and is further reason for this Court to reverse the convictions and dismiss the counts against him.

## CONCLUSION

For the foregoing reasons, Defendant-Appellant, Edward J. Woodard, respectfully requests that the Court reverse the appellant's conviction and dismiss the Indictment, with prejudice, or, in the alternative, grant the Defendant-Appellant a new trial, or otherwise grant the relief request herein.

## <u>ARGUMENT BY BRANDON WOODARD</u>

## I.  THE DISTRICT COURT ERRED BY FAILING TO DISMISS COUNT 1, CONSPIRACY, FOR INSUFFICIENT EVIDENCE

### Standard of Review

Sufficiency challenges are reviewed *de novo*. *United States v. Kelly*, 510 F.3d 433, 440 (4th Cir. 2007).

### Discussion

Brandon Woodard challenges the sufficiency of the evidence regarding Count 1 of the indictment, which alleges conspiracy to commit bank fraud, i.e. a scheme to defraud a financial institution. The governing statute contains two subsections:

Whoever knowingly executes, or attempts to execute, a scheme or artifice –

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

18 U.S.C. § 1344.

The Government focuses its charge against Brandon on Subsection (1), scheme to defraud a financial institution.  While other defendants employed directly by the bank were also charged in Count 1, the evidence as to those individuals suggests that the scheme involved Subsection (2) as well as Subsection (1).  As such, there are multiple schemes alleged which did not involve Brandon Woodard's direct participation.

The ways, manner and means of the conspiracy are set forth in the indictment, starting at I8.  Paragraph 65, 66 and 69 respectively refer to counts 16, 17 and 18 (I18-I19).  The language of the ways and means of the conspiracy differs significantly from the alleged specific substantive counts 16, 17, and 18.

Count 16 states that Edward Woodard and Steven Fields caused the bank to fund loans to facilitate the purchase of property known as Carolyn Way (Count 16) and Crawford Parkway (Count 17), and that Edward Woodard and Steven Fields caused the bank to fund two principal advances on two separate loans to Menden

and Hranowskyj to provide money to purchase property from Brandon (Count 18) (Paragraph 96, I19).  The conspiracy makes no mention of Brandon Woodard. Counts 16, 17, and 18 state that Edward Woodard and Brandon Woodard acted without reference to Fields.

Brandon Woodard is identified as a bank insider (I5-6).  He is alleged to have received compensation, commissions for commercial loan referrals (Incentives were available to all loan officers.  Commissions paid by borrower, not bank.), credit for loan and deposit accounts from other bank employees' portfolios (in existence for only 24 hours), payments of his personal legal expenses (pre-approved by bank in connection with loan), favorable loans (loans pre-dated the conspiracy), as well as his own expense accounts (expenses related to bank activity).  Count 1 does not make reference to unlawful participation in a loan, as referenced in the substantive counts 16, 17, and 18.

Brandon submits there is no substantial evidence to show that he employed false or fraudulent pretenses to deceive the bank.  The intended victim, if any, would have been the investors, not the bank.  No overt act alleged to have been committed by Brandon was illegal.  It is true that the acts furthered his purpose, but none of his purposes were illegal.  The evidence did not show that Brandon had knowledge of or committed any act in furtherance of any illegal purpose alleged in the indictment.

The circuits have not agreed on the mental state necessary to support a conviction under § 1344, nor the relationship between the statute's two Subsections. *United States v. Nkansah*, 699 F.3d 743, 762-63 (2nd Cir. 2012) and cases cited in Footnotes 9 and 10.

This circuit has interpreted § 1344(1) to require the government to prove that the defendant intended to deceive the bank by means of a scheme. *United States v. Brandon*, 298 F.3d 307 (4th Cir. 2002) and other cases cited therein at 311; *United States v. Allen*, 451 F.3d 178 (4th Cir. 2007).


## II.    THE DISTRICT COURT ERRED BY FAILING TO DISMISS COUNTS 16-18, UNLAWFUL PARTICIPATION IN A LOAN, FOR INSUFFICIENT EVIDENCE

### Standard of Review

The appellate court reviewed *de novo* the denial of a Rule 29 motion for judgment of acquittal. *United States v. Hickman*, 626 F.3d 756, 762 (4th Cir. 2010); *United States v. Green*, 559 F.3d 360, 367 (4th Cir. 2010), *cert. denied*; *United States v. Jaensch*, 665 F.3d 83, 91 (4th Cir. 2011).

Sufficiency challenges are reviewed *de novo*. *United States v. Kelly*, 510 F.3d 433, 440 (4th Cir. 2007).

### Discussion

18 U.S.C. § 1005 (Unlawful Participation in a Loan) Paragraph 4 states, in part, "whoever with intent to defraud any financial institution, participates and shares in or receives any money through a transaction [with] the financial institution."

At the conclusion of the government's evidence, Brandon made a motion for judgment of acquittal pursuant to Rule 29 on all counts. The court denied the motion on Count 1 (Conspiracy) and Count 26 (Bank Fraud), and took the motion under advisement with regard to Counts 16 through 18 (Unlawful Participation in a Loan).

The record clearly shows that the court was concerned with the question of whether or not the government's evidence established the requisite intent to injure the bank in connection with Counts 16 through 18.

Brandon submits that the court, having reserved its decision following defense motion made at the conclusion of the government's evidence, must decide the motion on the basis of the evidence at the time the ruling was reserved. Brandon submits that the court did not do so.

At the conclusion of all evidence, the court ruled on the renewed motion for judgment of acquittal, however, based its decision on reasoning not fully articulated, i.e. that there were "some issues, some issues of credibility, and other [unspecified] issues." The court appeared to be relying on grounds developed

during the presentation of the defense, rather than to relying on evidence presented during the government's case in chief.

After the jury returned its verdict of guilty, Brandon filed a motion for judgment of acquittal and a motion for new trial pursuant to Rules 29(c) and 33.

Rule 29(c) of the Federal Rules of Criminal Procedure provides that "if the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal" where the defendant has successfully challenged the sufficiency of evidence used to convict him. At this stage of the proceeding, the court should "construe the evidence in the light most favorable to the government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced." *United States v. Johnson*, 55 F.3d 976, 979 (4th Cir. 1995).

Concerning Count 16 – 18: Unlawful Participation in a Loan, the court acknowledged that the government was required to prove that Brandon benefitted from a loan with intent to defraud the bank. See 18 U.S.C. §1005.

The record does not support the conclusion that the three loans should not have been made. The new borrowers were acceptable candidates for the loans at the time the loans were approved. In light of this fact, whether or not Brandon knew the borrowers would take out loans from the Bank of the Commonwealth in order to finance the purchase of the first two properties, or would use proceeds of

existing loans on other properties, is of no import.  Furthermore, the record does not establish that the loans were under-secured; the properties were appraised at values exceeding the price paid to acquire.  Since the government did not prove either that the borrowers were not creditworthy at the time of closing, or that the loans were under-secured, Brandon submits that the evidence was insufficient to establish that he intended to defraud the bank.

It can be assumed that Brandon knew the value of the properties since he had owned all three properties for a period of time.  It cannot be assumed that he had any reason to believe that Menden and Hranowskyj were not suitable investors.  Outwardly, they appeared financially successful.

The government's argument that the borrowers were not creditworthy, i.e., that they were troubled borrowers, is based on post hoc observation that they eventually ended up in default.  Use of hindsight is inappropriate in determining whether or not the borrowers, at the time of the act, intended to default on the loan or to defraud the bank.

Count 16 and 17 involved transactions which took place in June 2008.  Count 18 took place in November 2008 and involved the borrowing of cash from other loans which had been previously approved.  As stated in the indictment paragraph 8, the bank began to come under suspicion for its lending policies in

September 2008, approximately three months after the sale by Brandon Woodard to Menden and Hranowskyj.

There is no evidence to suggest that Brandon Woodard knew, or had reason to believe, that Menden and Hranowskyj were troubled borrowers.  It might have been otherwise had Brandon Woodard been employed by the bank as a lending officer with access to borrowers' financials and a reason to review the loans applications on behalf of the bank.  However, Brandon was no so employed, nor was it his job to review their financial wherewithal.

The evidence suggests that most, if not all, of the negotiations preceding each of the transactions were conducted by others without Brandon's knowledge.

## III.   THE DISTRICT COURT ERRED IN CALCULATING THE LOSS ATTRIBUTABLE TO BRANDON WOODARD

### Standard of Review

Appellate Courts review the sentence imposed by the district court for abuse of discretion.  *Gall v. United States,* 128 S. Ct. 586.  Appellate Courts review *de novo*, a district court's interpretation of what constitutes a "loss" under the Guidelines, while accepting its loss calculation in the absence of clear error. *United States v. Allen*, 491 F.3d 178, 193 (4th Cir. 2007); *United States v. Jackson*, 524 F.3d 532, 546 (4th Cir. 2008).

**Discussion**

The presentence report calculated a loss of more than $20,000,000.00 (actual amount: $38,952,257.76) with a corresponding offense range of +22, pursuant to 2B1.1(b)(1)(L). (PSR Page 21 Par.108).  Brandon noted an objection to the presentence report.  During the sentencing hearing, the government argued for a lesser amount of $2,846,939.58.  The district court agreed and adjusted the loss amount downward, which resulted in an offense level +18, pursuant to 2B1.1(b)(1)(J). (Sentencing Hearing Page 79).  Brandon submits that the district court abused its discretion in calculating the loss attributable to Brandon's actions.

Loss under subsection (b)(1) is defined as the greater of actual loss or intended loss.  Actual loss is the reasonable foreseeable pecuniary harm that results from the offense.  Intended loss is the pecuniary harm that was intended to result from the offense.  U.S.S.G. § 2B1.1, cmt. 3 (2012).

Brandon objects to the loss associated with the Suffolk branch in the amount of $1,713,723.27 on the grounds that this loss was not associated with any bank-related conduct.  Brandon purchased the Suffolk property with an existing building on it and placed a loan against the property in the amount of $550,000.00 with The Farmers Bank.  The Bank renovated the property in order to bring it up to their standards as a financial institution.  Once the property was improved, Brandon went back to Farmers Bank and borrowed an additional $1,125,000.00, pledging

the property as improved to Farmers Bank.  Brandon had two other loans with

Farmers Bank; both of them went into default.  As a result, both properties were

foreclosed on and a deficiency balance was created.  The properties were cross-

collateralized and Farmers Bank, with a deficiency of approximately $400,000.00,

then initiated foreclosure proceedings against the Suffolk branch.   The Bank was

occupying the premises and paying rent on time. When the Bank went out of

business and was taken over by Southern Bank, Southern also occupied the

premises and paid the rent on time.  At all times, the mortgages were current.

Also, Southern Bank indicated a desire to remain on the premises and to keep

paying the monthly rent, and was only forced out by Farmers Bank who liquidated

this third piece of property owned by Brandon to satisfy their default judgments on

the first two pieces of property.

The loss represents the loss of renovation expense. However, this expense would never have been realized but for the Farmers Bank foreclosure against Brandon. The Bank of the Commonwealth and its successor, Southern Bank, would have enjoyed the benefit of the improvements throughout the terms of the lease, and would not have sustained a loss had Farmers Bank not initiated independent action. The Bank of the Commonwealth did not sustain a loss as a result of Brandon's criminal conduct.

Brandon received two commissions for referring commercial loans to the Bank in the amount of $42,731.00. However, the Bank raised its standard origination fee from 1% to 2 – 3% on these loans. The Bank then split the commission with Brandon and made a net profit, not a loss.

It was not foreseeable for Brandon to know that Menden and Hranowskyj would borrow money from other existing loans in order to finance the purchase of York Street. After making the purchase for cash, Menden and Hranowskyj placed a $250,000.000 loan against the property; that loan eventually went into default. The question becomes whether or not Brandon had any reasonable expectation that they would borrow money against this property after having purchased it for cash. He did not.

## IV.  THE DISTRICT COURT ERRED BY IMPOSING A TWO-LEVEL INCREASE FOR ABUSE OF A POSITION OF TRUST

### Standard of Review

Appellate Courts review the sentence imposed by the district court for abuse of discretion. *Gall v. United States,* 128 S. Ct. 586. "The district court's application of §3B1.3 is a sophisticated factual determination that we review for clear error." *United States v. Burke*, 431 F.3d 883, 889 (5th Cir. 2005).

## Discussion

Brandon objects to the two-level increase pursuant to § 3B1.3 of the U.S.S.G., abuse of position of public trust in a manner that significantly facilitated the concealment of the offense. §3B1.3 encompasses two factors: (1) whether the defendant occupies a position of trust and (2) whether the defendant abused his position in a manner that significantly facilitated the commission of concealment of the offense.

Brandon submits that he did not hold a "position of trust" with The Bank of the Commonwealth. He worked exclusively for Community Home Mortgage of Virginia, a subsidiary of The Bank of the Commonwealth.

The government argued that as a Vice President of the Bank's mortgage subsidiary, Brandon occupied a position of trust as to the Bank. The government cites the *United States v. Septon* 557 F.3d 934, 938 (8th Cir. 2009) (upholding application of abuse of trust enhancement to relationship between mortgage broker and bank). In *United States v. Wright* 496 F.3d 371, 377 (5th Cir. 2007) (applying abuse of trust enhancement to commercial relationship between mortgage broker and lender, because mortgage industry's structure fosters lender's reliance on broker).

Brandon submits that neither case is pertinent to this factual setting. Both cases recognize the relationship of trust between brokers and lenders. Brandon sold property to Menden and Hranowskyj, who were two bank customers. Brandon did not occupy a position of trust given to him by the bank requiring him to present any truthful or accurate information in order for the Bank to make their credit-based decisions. Brandon did not process the loan application or make any representation to the Bank regarding the borrower's financial responsibility. He offered the property for sale; whether or not the sale was approved by the bank was beyond his control. Brandon submits that there is no legally-recognized relationship of trust between sellers and lenders.

Even if Brandon occupied a position of trust, that position did not significantly facilitate the commission of concealment of the offense because he

did nothing directly to facilitate the loan application. Menden and Hranowskyj, borrowers, acted through a bank loan officer and the various loan committees in connection with the approval of the loan and the sale of the property. There was no reliance on any statement made by Brandon to the bank. Further, Menden and Hranowskyj cannot be considered victims, as they were not deceived in any fashion by Brandon, nor was any reliance on any representation made by Brandon that was proven to be false.

The Court also found that Brandon abused his position of trust by referring commercial loans to the Bank. Only after the loans were approved and closed was a portion of the Bank's origination fee funneled back to him (48-49).

According to the pre-sentence report, the Defendant made the detection of the offense, and his responsibility for such, more difficult by having another bank employee change the terms of six loans that he had with the bank (PSR A-4). [Referring to the refinancing of the six Alabama loans.] There was no discussion of the modification of the six loans to Summit in connection with the properties in Alabama during the sentencing hearing.

## V.    BRANDON WOODARD JOINS THE ARGUMENTS BY CO-APPELLANTS

Pursuant to Rule 28(i) of the Federal Rules of Appellate Procedure, Brandon joins in and adopts by reference the arguments of co-appellants Stephen Fields and Edward Woodard.

## Conclusion

For the foregoing reasons, Brandon respectfully requests that this Honorable Court vacate his conviction, and remand the case to the district court for dismissal of the charges, for a new trial or resentencing, consistent with the arguments above.

## ORAL ARGUMENT REQUEST AS TO ALL APPELLANTS

All Appellants respectfully request oral argument as it will aid the Court in the decisional process, especially in light of the length and complexity of the proceedings and the record in this case, and the fact that each Appellant presents unique issues on appeal. For the same reasons, Appellants also respectfully request additional time for oral argument.